**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Katherine PAPPADOPOULOS,**
**Defendant–Appellant.**

**No. 93–10577.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 13, 1995.

Decided Aug. 25, 1995.

As Amended on Denial of Rehearing
and Suggestion for Rehearing
En Banc Nov. 13, 1995.

Lauren J. Weil, Asst. Federal Defender, Sacramento, CA, for defendant-appellant.

Steven R. Lapham, Asst. U.S. Atty., Sacramento, CA, for plaintiff-appellee.

Appeal from the United States District Court for the Eastern District of California.

Before: WALLACE, Chief Judge, HUG, and FARRIS, Circuit Judges.

Opinion by Chief Judge WALLACE; Concurrence by Judge FARRIS.

WALLACE, Chief Judge:

Katherine Pappadopoulos appeals from her convictions for conspiracy, 18 U.S.C. § 371, arson, 18 U.S.C. § 844(i), arson to commit another felony, 18 U.S.C. § 844(h)(1), mail fraud, 18 U.S.C. § 1341, and interstate transportation of property taken by fraud, 18 U.S.C. § 2314. The district court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand.

I

Pappadopoulos and her husband, who were experiencing severe financial trouble, conspired with Orfanos to burn the Pappadopouloses' 10,000 square foot home in Sacramento, California. In August 1992, the Pappadopouloses went to Greece, where they received numerous telephone calls from Orfanos. Two of these calls, taped by Orfanos, pertained to the method Orfanos would use to burn the home. On September 1, Orfanos entered the home, poured lacquer thinner throughout, and set fire to the residence. After the fire, Orfanos called a friend, Marshall, and explained that the house was on fire and that his car was still in the garage of the home and that he needed a ride. Orfanos called the Pappadopouloses at least three times that day, borrowed $2,500 from Marshall for a plane ticket to Greece, and, on the way to the airport, gave Marshall a copy of the two recorded conversations, telling her that it was his "insurance" to show the fire was not his idea.

After the fire, the Pappadopouloses returned from Greece, retained the services of a public insurance adjuster and submitted a claim to their insurer for over $4 million, including living expenses of over $20,000 per month. The Pappadopouloses both were subsequently indicted by the grand jury. Orfanos fled the country and remains a fugitive. The Pappadopouloses were tried together and convicted, but Mr. Pappadopoulos fled the country before sentencing.

II

■ We first discuss Pappadopoulos's conviction under 18 U.S.C. § 844(i), which provides:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property *used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce* shall be imprisoned for not more than ten years or fined not more than $10,000, or both....

(Emphasis added.) Thus, an essential element of the crime of arson under section 844(i) is that the property was "used in" or "used in any activity affecting" interstate or foreign commerce. *See United States v. Karlic*, 997 F.2d 564, 571 (9th Cir.1993) (*Karlic*). Like other elements of the offense, this "jurisdictional element" must be proved to the jury beyond a reasonable doubt. *See United States v. Nukida*, 8 F.3d 665, 669–73 (9th Cir.1993) (*Nukida*) (juris-

dictional elements of offenses must be determined by the finder of fact at trial).

## A.

To establish this jurisdictional element, the government relied exclusively on one theory: that the Pappadopoulos residence was "used in" or "used in an activity affecting" interstate commerce because it received natural gas from out-of-state sources. The government introduced evidence sufficient to permit the jury to find that the Pappadopoulos residence received natural gas from Pacific Gas & Electric which was derived, at least in part, from out-of-state sources.

The district court correctly instructed the jury that the government had to prove that the house was "used in interstate commerce or in an activity affecting interstate commerce." The district court further instructed the jury: " 'Interstate commerce' means commerce or business between any place in one state and another place outside the state. It also means commerce between places within the same state, but passing through any place outside that state." Finally, the court stated: "A building, including a private residence, is used in interstate commerce, or in an activity affecting interstate commerce, if it is supplied with natural gas which has moved in interstate commerce."

Pappadopoulos contended at trial that the district court lacked subject matter jurisdiction over the arson-related counts on the theory that the residence's receipt of natural gas from out-of-state sources was insufficient as a matter of law to establish the requisite nexus to interstate commerce. She presented this argument by means of a pretrial Rule 12(b) motion to dismiss, which was deferred and then renewed at the close of the government's case-in-chief. Pappadopoulos also objected to the jury instructions on the same theory—that they effectively eliminated an essential (and jurisdictional) element of the offense. Pappadopoulos presents the same arguments on appeal.

## B.

To answer these questions, we turn to the Supreme Court's recent watershed opinion in *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (*Lopez*). At first blush, the question whether a private residence is sufficiently connected to interstate commerce within the meaning of section 844(i) by virtue only of its receipt of natural gas from a company that derives that gas from out-of-state sources might appear to be solely a matter of statutory construction—whether such a house is "used in" or "used in any activity affecting" interstate commerce. *See United States v. Mennuti,* 639 F.2d 107 (2d Cir.1981) (concluding that Congress did not intend in section 844(i) to federalize the arson of a private residence but assuming that Congress had the power to do so).

However, the Supreme Court has held that the statutory language in section 844(i) "expresses an intent by Congress to exercise its full power under the Commerce Clause." *Russell v. United States,* 471 U.S. 858, 859, 105 S.Ct. 2455, 2456, 85 L.Ed.2d 829 (1985) (*Russell*). Therefore, the question we must decide is whether Congress could constitutionally prohibit the destruction of the Pappadopoulos residence under the power vested in it by the Commerce Clause "[t]o regulate commerce ... among the several States." U.S. Const., Art. I, § 8, cl. 3. *See United States v. Stillwell,* 900 F.2d 1104, 1107–10 (7th Cir.) (concluding that *Russell*'s interpretation of the pertinent legislative history precludes reliance on *Mennuti*'s holding that, as a matter of statutory construction, section 844(i) does not cover any private residence not used for business purposes), *cert. denied,* 498 U.S. 838, 111 S.Ct. 111, 112 L.Ed.2d 81 (1990). *Russell* left open the question whether all private residences are covered by section 844(i), concluding that section 844(i) reached "all business property, as well as some additional property that might not fit that description, but perhaps not every private home." *Russell,* 471 U.S. at 862, 105 S.Ct. at 2457.

The Supreme Court has identified three broad categories of activity that Congress may regulate under its Commerce Clause power. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1629; *Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971) (*Perez*). "First, Congress may regu-

late the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress's commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.,* those activities that substantially affect interstate commerce." *Lopez,* —— U.S. at ——–——, 115 S.Ct. at 1629–30 (citations omitted); *see also Perez,* 402 U.S. at 150, 91 S.Ct. at 1359 (same).

In *United States v. Robertson,* —— U.S. ——, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995) (per curiam), the Supreme Court explained that these three bases of congressional authority are analytically distinct. *Robertson* concluded that transporting equipment and workers from out-of-state into Alaska to further an illegal mining operation was interstate commerce activity subject to congressional regulation without regard to the "affecting commerce" test. *Id.* As the Court stated: "The 'affecting commerce' test was developed in our jurisprudence to define the extent of Congress's power over purely *intra*state commercial activities that nonetheless have substantial *inter*state effects." *Id.* at ——, 115 S.Ct. at 1733 (emphasis in original).

Unlike the activity in *Robertson,* the residence here was purely private and was not "engaged in" or "used in" interstate commercial activity. Its only relationship to interstate commerce was that it received a supply of natural gas from a company that obtained some of that gas from outside the state. Because the residence was neither part of the "channels of interstate commerce" nor an instrumentality of interstate commerce, the government must rely on Congress's power to regulate intrastate activities that "substantially affect" interstate commerce. Calling to our attention cases such as *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), the government contends that even though the effect on commerce of the destruction of one residence that receives out-of-state gas might be trivial, the combined

effect "of many others similarly situated, is far from trivial." *Id.* at 128, 63 S.Ct. at 90.

The government's argument does not get it home free. *Lopez* makes it clear that the *Wickard* line of cases "may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *Lopez,* —— U.S. at ——–——, 115 S.Ct. at 1628–29, *quoting NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937). *Lopez* held that the enactment of a federal statute that prohibited the possession of a firearm in a "school zone" exceeded Congress's authority under the Commerce Clause because the statute sought to regulate purely local activity. As the Court explained, "[e]ven *Wickard,* which is perhaps the most far reaching example of Commerce Clause authority over intrastate activity, involved economic activity in a way that the possession of a gun in a school zone does not." *Id.* at ——, 115 S.Ct. at 1630. Like the statute at issue in *Lopez* and unlike the case in *Wickard,* the conduct regulated by section 844(i)—arson—is not commercial or economic in nature.

We recognize that *Lopez* presented the Commerce Clause issue in a somewhat different posture, as there the question was whether Congress had exceeded its commerce powers in adopting a statute, whereas here the question is whether a jurisdictional element required to ensure the constitutional application of a statute has been met. This difference might be significant in another case, but it is not in the case before us.

Many federal statutes that regulate activities that have traditionally been matters of purely local or state concern seek to limit their reach to constitutional bounds by requiring case-by-case determinations that a connection to interstate commerce exists. In reviewing a conviction under a federal criminal law that contains a jurisdictional element, we usually must determine not whether Congress constitutionally could have enacted such a statute, but whether the jurisdictional element provided by Congress to ensure the

constitutional application of the statute has been met. In making such determinations, we are frequently asked to decide just how significant the contacts to interstate commerce must be.

■ *Lopez* clearly holds that the connections to or effect on interstate commerce must be "substantial." The question is whether its analysis should be applied when the issue is how significant the contacts to interstate commerce must be in individual cases in order to assure the constitutionality of a statute that relies on a jurisdictional element. We hold that it does. We conclude that in a case such as this, where Congress seeks to regulate a purely intrastate noncommercial activity that has traditionally been subject to exclusive regulation by state or local government, and where the connection of the regulated activity as a whole to interstate commerce is neither readily apparent nor illuminated by express congressional findings, the government must satisfy the jurisdictional requirement by pointing to a "substantial" effect on or connection to interstate commerce.

### C.

■ *Lopez* demonstrates that the receipt of natural gas at the Pappadopoulos residence from out-of-state sources is insufficient as a matter of law to confer federal jurisdiction over the section 844(i) count. The residence was not used at all for commercial activity. It was purely private. If the Commerce Clause were extended to reach the activity that the government seeks to punish here, we would be "hard-pressed to posit any activity by an individual that Congress is without power to regulate." *Id.* at ——, 115 S.Ct. at 1632. "Under our federal system, the States possess primary authority for defining and enforcing the criminal law. When Congress criminalizes conduct already denounced as criminal by the States, it effects a change in the sensitive relation between federal and state criminal jurisdiction." *Id.* at —— n. 3, 115 S.Ct. at 1631 n. 3 (internal citations and quotations omitted).

Our recent opinions in *United States v. Hanna*, 55 F.3d 1456 (9th Cir.1995), and *United States v. Oliver*, 60 F.3d 547 (9th Cir.1995), are consistent with this analysis. First, because the federal anti-carjacking statute upheld in *Oliver*, 18 U.S.C. § 2119, requires that the car "has been transported, shipped, or received in interstate or foreign commerce," it comes within Congress's power to regulate articles or goods in commerce as well as its power to regulate activities substantially affecting interstate commerce. While Congress's power to regulate articles or goods in commerce may not permit it to regulate an item for eternity simply because it has once passed state lines, *see Nukida*, 8 F.3d at 671 (citing cases regarding the loss of an item's interstate character), Congress's power to regulate the instrumentalities and channels of interstate commerce also comes directly into play as motor vehicles themselves constitute an important instrument of commerce, and our highways, which are directly affected by carjacking violence, constitute perhaps our most vital channel or artery of interstate commerce.

The statute upheld in *Hanna*, 18 U.S.C. § 922, makes it illegal for certain persons, including felons, "to ship or transport in interstate or foreign commerce, or possess in or affecting interstate commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." Because of its relatively restrictive language, section 922 can rationally be seen as regulating the interstate transportation of firearms and ammunition. Although *Hanna* is perhaps a more difficult case than *Oliver* because it does not directly involve Congress's power to regulate the channels and instrumentalities of interstate commerce, the statute in *Hanna* draws support from Congress's power to regulate the interstate transportation of articles or goods in commerce. Indeed, the conviction at issue in *Hanna* that was upheld against facial challenge was not predicated on the argument that the firearm affected interstate commerce, the aspect of Congress's Commerce Clause power relied on here, but on the fact that the firearm had previously moved in interstate commerce.

Unlike a firearm or a car, both of which can readily move in interstate commerce, a house has a particularly local rather than

interstate character. Moreover, a private residence that merely receives natural gas from out-of-state sources is neither an article nor an instrumentality of commerce. The arson of such a structure has only a remote and indirect effect on interstate commerce.

■ Recent Supreme Court opinions also support our analysis, as they make it clear that the *Wickard* line of cases should not be read as extending to Congress limitless power to enact criminal statutes prohibiting purely intrastate activities that have only the remotest connection to interstate commerce. As the Court reminded us in *Lopez:* "The Constitution creates a Federal Government of enumerated powers.... '[T]he powers delegated by the ... Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite.'" *Id.* at ——, 115 S.Ct. at 1626, *quoting* The Federalist No. 45 (James Madison). We must not forget that "federalism was the unique contribution of the Framers to political science and political theory." *Id.* at ——, 115 S.Ct. at 1638 (Kennedy, J., joined by O'Connor, J., concurring). "Just as the separation and independence of the coordinate branches of the Federal Government serves to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Id.* at ——, 115 S.Ct. at 1626 (majority opinion), *quoting Gregory v. Ashcroft,* 501 U.S. 452, 458, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991). Given the importance of federalism to our scheme of government and its central role in the preservation of liberty, we must jealously preserve the balance of power between the federal and state governments.

This is a simple state arson crime. It should have been tried in state court. But the question goes beyond federalism concerns—it involves our jurisdiction. Where the sole source of the interstate commerce connection is the receipt by a private home of natural gas from a company that receives some of that gas from an out-of-state source, federal jurisdictional requirements have not been met.

## III

We now turn to Pappadopoulos's conviction under 18 U.S.C. § 844(h)(1), which provides: "Whoever ... uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States ... shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for five years."

■ Although Pappadopoulos argues that the failure to satisfy the jurisdictional element of section 844(i) requires reversal of all three "arson-related counts," section 844(h), which is independent of section 844(i), contains no requirement that any property have any connection to interstate commerce. *See Karlic,* 997 F.2d at 571 ("Section 844(i) requires proof of damaging or attempting to damage 'property used in interstate or foreign commerce or in any activity affecting interstate commerce,' an element not required by § 844(h)."). Section 844(h) does not facially exceed Congress's commerce power because it requires that the underlying felony itself be one that can be prosecuted "in a court of the United States." The crimes underlying Pappadopoulos's conviction under 18 U.S.C. § 844(h)(1) are mail fraud, in violation of 18 U.S.C. § 1341, and interstate transportation of property obtained by fraud, 18 U.S.C. § 2314. Pappadopoulos does not contend that federal jurisdiction is lacking over either of these underlying felonies.

## IV

■ Unlike the section 844(h) conviction, the conspiracy conviction must be reversed along with the section 844(i) count. The indictment contained a single conspiracy count which in turn recited several objects of the conspiracy, including both the section 844(i) and section 844(h) violations. Because it is possible that the jury found Pappadopoulos guilty of conspiracy solely on the basis that she conspired to violate section 844(i), the conspiracy conviction must be reversed. *See United States v. Manarite,* 44 F.3d 1407, 1413–14 (9th Cir.1995) (conspiracy conviction must be reversed if one of multiple objects is later determined to be legally inadequate to support conviction).

## V

■ Pappadopoulos argues that we should reverse her convictions for mail fraud, 18 U.S.C. § 1341, interstate transportation of property taken by fraud, 18 U.S.C. § 2314, but she does not specify any particular grounds for reversal. Because she argues that the district court erroneously admitted certain statements into evidence and allowed the use of her picture to assist the jury in knowing who was speaking in a recorded conversation, we assume she contends that these errors warrant reversal of these convictions. We review for abuse of discretion a district court's decision to admit evidence under Federal Rule of Evidence 403. *United States v. Crespo de Llano*, 838 F.2d 1006, 1018 (9th Cir.1987). The same is true in the use of aids in listening to recorded conversations. *United States v. Taghipour*, 964 F.2d 908, 910 (9th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 283, 121 L.Ed.2d 210 (1992).

■ Pappadopoulos does not object to the tape and translation itself. Rather, she argues that because the government presented the translation with video accompaniment that portrayed her in an unflattering manner, the translation and video were more prejudicial than probative. Although the photograph of Pappadopoulos used in the video may not have presented her on her best day, the district court did not abuse its discretion by finding that the probative value of the video was not substantially outweighed by the danger of unfair prejudice. *See United States v. Gutierrez*, 995 F.2d 169, 172 (9th Cir.1993).

■ Pappadopoulos argues that her Sixth Amendment right to confront the witnesses against her was violated when the district court allowed Marshall to testify about Orfanos's statements made immediately after the fire. Marshall testified that after she picked up Orfanos, he made statements regarding how the fire was set and the contents of the cassette recording, which he asked Marshall to hold for him as "insurance" to prevent Mr. Pappadopoulos from taking advantage of him again. The district court admitted Marshall's testimony regarding Orfanos's statements under Federal Rule of Evidence 804(b)(3).

Rule 804(b)(3) provides that when the declarant is unavailable, his statements are not excluded by the hearsay rule if:

> at the time of its making [the statement was] so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

Fed.R.Evid. 804(b)(3).

■ When the hearsay statement is offered to exculpate the defendant, three requirements must be met. The declarant must be unavailable, the statement must tend to subject the declarant to criminal liability such that he would not have made it unless believing it to be true, and there must be corroborating circumstances that indicate the trustworthiness of the statement. *United States v. Nazemian*, 948 F.2d 522, 530 (9th Cir.1991), *cert. denied*, — U.S. ——, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992).

The first two requirements are clearly met. The question that remains is whether corroborating circumstances affirming the statement's trustworthiness are necessary when the hearsay statement inculpates the defendant. It is unnecessary to decide this question, however, because even if the requirement applies in this case, there are more than enough corroborating circumstances to indicate the trustworthiness of the statement. Orfanos voluntarily made the statements to a friend whose help he sought immediately after setting the fire. The physical evidence established both Orfanos's involvement in the fire (his burned car in the Pappadopoulos garage, empty lacquer thinner cans, and testimony of Marshall that Orfanos reeked of paint thinner and was burned when she picked him up) and his recording of the conversations between himself and the Pappadopouloses. We therefore conclude there was sufficient corroboration and other indicia of reliability to support the district court's decision to admit the evidence under Rule 804(b)(3). *See United States v. Layton*, 855 F.2d 1388, 1405 (9th Cir.1988),

**530**

cert. denied, 489 U.S. 1046, 109 S.Ct. 1178, 103 L.Ed.2d 244 (1989).

## VI

 Finally, Pappadopoulos argues that the district court erred when it ordered her to pay restitution in the amount of $994,-005.65. We review for abuse of discretion the district court's decision to require a defendant to pay restitution, provided that it is within the bounds of the statutory framework. *United States v. Woodley*, 9 F.3d 774, 780 (9th Cir.1993).

 Pappadopoulos argues that the district court erroneously concluded she had the present or future capability to make restitution. An order of restitution, however, will not be vacated as long as the district court considered the circumstances affecting the defendant's ability to pay and the record reflects some evidence that the defendant may be able to pay the amount in the future. *United States v. Newman*, 6. F.3d 623, 631 (9th Cir.1993); *United States v. Smith*, 944 F.2d 618, 623 (9th Cir.1991), *cert. denied*, 503 U.S. 951, 112 S.Ct. 1515, 117 L.Ed.2d 651 (1992).

The record indicates that the district court did consider a variety of factors in deciding to order restitution. For example, the district court considered the liquidation value of all the husband's assets that would go through receivership. The court also considered the value of the Pappadopouloses' vacation homes, business, stocks, etc. Because the record indicates that Pappadopoulos may be able to pay, the district court did not abuse its discretion by ordering her to pay restitution.

Although we have reversed the section 844(i) and conspiracy counts, the amount of loss sustained by the victims as a result of the fire is the same irrespective of whether the restitution order is based on a single section 844(h) conviction or three convictions flowing from the same conduct. Moreover, the fraud convictions, upon which most of the restitution is based, as well as Pappadopoulos's culpability, remain entirely undisturbed. We therefore affirm the restitution order.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

FARRIS, Circuit Judge, concurring:

In *United States v. Lopez*, —— U.S. ——, ——, 115 S.Ct. 1624, 1630, 131 L.Ed.2d 626 (1995), the Supreme Court held that Congress may regulate intrastate activities that substantially affect interstate commerce. *See also United States v. Robertson*, —— U.S. ——, ——, 115 S.Ct. 1732, 1733, 131 L.Ed.2d 714 (1995). In part II we determine whether a private home supplied with out-of-state natural gas satisfies this test. If it does not, the government has not satisfied the jurisdictional element of 18 U.S.C. § 844(i), and Pappadopoulos's conviction must be reversed.

I agree with the majority's opinion that "[t]he arson of a [private home] has only a remote and indirect effect on interstate commerce." The receipt of interstate natural gas does not establish a sufficient nexus with interstate commerce. *See United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971).

The Supreme Court has upheld a variety of congressional Acts regulating intrastate economic activity even if individual cases only indirectly affect interstate commerce. *Lopez*, at ——, 115 S.Ct. at 1630. The rationale is that the aggregate effect of economic regulation is substantial. In *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), for example, the Supreme Court upheld a statute establishing quotas for wheat production. Although Roscoe Filburn's wheat production had at most an "indirect" effect on interstate commerce, the regulations' aggregate effect on all wheat production "is not trivial." *Id.* at 119, 128, 63 S.Ct. at 90. This case, however, does not qualify as economic regulation. Prohibiting arson of private homes "is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, at ——, 115 S.Ct. at 1631.