**UNITED STATES of America,
Plaintiffs,**

v.

**Efraim GARCIA, Defendant.**

No. 97–80727.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 22, 1999.

William Sauget, AUSA, Detroit, MI, for Plaintiffs.

Jeffrey Urdanger, Chicago, IL, Harold Gurewitz, Birmingham, MI, for Defendants.

## OPINION & ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS THE THIRD SUPERCEDING INDICTMENT

EDMUNDS, District Judge.

For the alleged intentional killing of Evan Ison, the Government has charged Efraim Garcia with murder in aid of racketeering activity in violation of 18 U.S.C. § 1959(a)(1) ("VCAR") in Count IV. In connection with this count, the Government filed a Notice of Intent to Seek the Death Penalty pursuant to 18 U.S.C. § 3593(a). Garcia is also charged in Count III with conspiracy to violate VCAR. He has moved to dismiss the charges filed

---

against him, arguing that the allegations supporting federal jurisdiction are insufficient. With respect to Counts III and IV, this Court agrees.[1]

## I. Standard of Review

 Pursuant to Fed.R.Crim.Pro. 12(b)(2), a defendant may raise "[d]efenses and objections based on defects in the indictment or information" before trial. Fed.R.Crim.Pro. 12(b)(2). Challenges to the efficacy of federal jurisdiction may be raised at any time during the pendency of the proceedings. *Id.; United States v. Vanover,* 888 F.2d 1117, 1120 (6th Cir. 1989), *cert. denied,* 495 U.S. 934, 110 S.Ct. 2177, 109 L.Ed.2d 506 (1990). As used in Rule 12, jurisdiction refers to jurisdiction over the subject matter. *United States v. Chambers,* 944 F.2d 1253, 1259–60 (6th Cir.1991), *cert. denied sub nom., Lucas v. United States,* 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992). A district court may make "preliminary findings of fact necessary to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate finder of fact." *United States v. Levin,* 973 F.2d 463, 467 (6th Cir.1992).

## II. Statement of Facts

Efraim Garcia is alleged to have been a member of a street gang known as the Cash Flow Posse. This gang allegedly formed in 1988–89 to counteract high pressure recruiting tactics of two nationally recognized street gangs, the Latin Counts and the Cobras, who attempted to recruit new members in southwest Detroit. In lieu of joining the existing gangs, twelve young men created their own group, the "Cash Flow Posse."

The indictment alleges that gang members engaged in numerous acts of murder and assault. Garcia is alleged to have murdered Douglas Williams, LaVonda

---

[1]. Garcia is also charged, in Counts I and II, with violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961(1), § 1961(5), § 1962(c). As discussed herein, Defendant's motion to dismiss those counts is denied.

Brown, James Goings, Annie Johnson, and Evan Ison. The alleged murder of Evan Ison occurred on or about November 26, 1994 in the City of Detroit. Garcia is alleged to have murdered Evan Ison by fatally shooting him in the head at close range.

He is also alleged to have conspired to murder and to have assaulted with the intent to murder Shirley Johnson. Finally, he is alleged to have committed several other assaults with intent to murder and to have conspired with other members of the Cash Flow Posse to murder rival gang members.

Specifically, the Third Superceding Indictment (hereinafter "indictment") alleges four counts:

Count I: Racketeer Influenced and Corrupt Organizations Act, ("RICO"), 18 U.S.C. § 1962(c); § 1961(1); § 1961(5). The Cash Flow Posse, of which Garcia was allegedly a member, is alleged to be an enterprise as that term is defined in 18 U.S.C. § 1961(4). It is alleged that the enterprise engaged in, and that its activities affected, interstate commerce, in that

(1) Gang members traveled on an interstate highway (I–94) from Detroit to Port Huron (which are both Michigan cities) to commit murders;

(2) One gun used by gang members was manufactured in another state;

(3) Guns used by the gang were purchased at the Gibraltar Trade Center, which frequently does business with citizens from other states;

(4) One gang member heard from a cellmate that a law enforcement officer had alluded to the possibility of Cash Flow Posse "cells" existing in other states; and

(5) Two gang members, in their plea colloquies, acknowledged discussing, with outside parties, the law enforcement initiatives against the Cash Flow Posse while on a trip to Mexico.

The indictment further alleges that the enterprise engaged in a pattern of racketeering activity consisting of twelve acts, including murder and assault which are punishable under state law. The indictment does not allege other predicate acts which typically accompany a RICO claim such as kidnapping, extortion, robbery, or money laundering. The predicate acts are common law crimes that are traditionally prosecuted by the states.[2]

Count II charges the Defendant with RICO conspiracy in violation of 18 U.S.C. § 1962(d). It alleges that from January 1988 until March 11, 1999, the Defendant conspired with others to violate 18 U.S.C. § 1962(c), which forms the basis for Count I. The pattern of racketeering activity consists of the various acts delineated in Count I.

Count III charges the Defendant with a violation of 18 U.S.C. § 1959, which prohibits violent crimes in aid of racketeering ("VCAR"). In connection with this count, Garcia allegedly conspired with others to murder rival gang members for the purpose of maintaining and increasing his position in the Cash Flow Posse.

Finally, Count IV alleges that Garcia violated 18 U.S.C. § 1959 by murdering

---

**2.** The indictment alleges a pattern of racketeering activity, based only upon "acts involving murder." Thus, the predicate acts that form the basis for the RICO counts are based solely on violation of Michigan's murder statutes including Mich.Comp.Laws Ann. § 750.157(a); Mich. Comp. Laws Ann. § 750.316(1)(a); and Mich.Comp.Laws Ann. § 750.316. The predicate acts do not include other, traditional RICO allegations such as robbery, hijacking, car theft, drugs, and extortion, which are more commonly present in

RICO prosecutions. *See, e.g. United States v. Diaz,* 176 F.3d 52 (2d Cir.1999)(enterprise engaged in large-scale drug operation); *United States v. Polanco,* 145 F.3d 536 (2d Cir.1998)(enterprise engaged in offenses involving drug and gun trafficking); *United States v. Torres,* 129 F.3d 710 (2d Cir.1997)(enterprise engaged in acts involving drugs, murder, extortion, armed robbery and firearms offenses); *United States v. Brady,* 26 F.3d 282 (2d Cir.1994)(enterprise engaged in extortionate credit transactions).

Evan Ison. Count IV alleges that he committed the murder for the purpose of maintaining and increasing his position in the Cash Flow Posse. It is in connection with this count that the Government filed its Notice of Intent to Seek the Death Penalty pursuant to the Federal Death Penalty Act of 1994, ("FDPA") 18 U.S.C. § 3591, et. seq. The murder alleged in Count IV allegedly occurred on or about November 26, 1994, and thus is the only individual act of murder Garcia is alleged to have committed since the passage of the FDPA, which provides for the possibility of a death sentence, if proven.[3] The indictment alleges that the Defendant committed this murder "deliberately, with the intent to kill, and with premeditation ... in violation of Michigan Compiled Laws § 750.316." *See* Third Superceding Indictment, Count IV at p. 14.

Of the eight defendants indicted by the government, only Garcia was charged with an individual substantive count under VCAR and only Garcia faces the death penalty. The violent act which constitutes Count IV is an intentional killing punishable under Michigan law. Wilson Rivera, a federally unindicted yet alleged co-gang member of Defendant Garcia's, is currently serving two life sentences without the possibility of parole for two of the murders that Garcia is alleged to have committed under Count I of the Third Superceding Indictment. The first two iterations of the indictment charged the murder of Evan Ison only as a predicate RICO act, not as an individual VCAR count. The RICO counts carry mandatory life in prison sentences in the event of conviction. It was not until the Second Superceding Indictment that Garcia was charged with the murder of Evan Ison as a separate VCAR offense in Count IV, thereby establishing a basis for the government to seek the death penalty.

## III. Federal Death Penalty Act

In 1994, Congress passed the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591 *et. seq.*, which delineates the procedures which must be followed in a case in which the Government seeks the death penalty. The intentional killing alleged in Count IV is charged under the VCAR statute, which carries with it the possible sentence of death, if proven.[4] Section 1959(a)(1) provides,

> *Whoever,* as consideration to the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, *murders,* kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, *shall be punished—(1) for murder, by death* or life imprisonment ....

18 U.S.C. § 1959(a)(1) (emphasis added).

The Government alleges that the murder of Evan Ison falls within this section, and it is this offense which forms the basis for the Government's Notice of Intent to Seek the Death Penalty. If the Government proves beyond a reasonable doubt that Garcia committed this capital offense, the jury would proceed to consider, under FDPA, whether the punishment of death is justified under the circumstances. 18 U.S.C. § 3591(a).

## IV. The Commerce Power

### A. United States v. Lopez

▮ Because Congress does not have unlimited ability to pass criminal legisla-

---

3. The Federal Death Penalty Act became effective on September 13, 1994. *See* 18 U.S.C. § 3591.

4. Count III is based on conspiracy to violate VCAR, however, the Government does not seek to have the death penalty imposed on Count III.

tion, all federal criminal statutes must have some nexus to a federal constitutional power. This nexus is often found in the Commerce Clause. Article I, Section 8, Clause 3 of the U.S. Constitution grants Congress the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3. This language, commonly referred to as the Commerce Clause, gives Congress the power to regulate "three broad categories of activity": (1) that involving the use of channels of interstate commerce; (2) that involving instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities, and finally (3) that substantially affecting interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). It is the third category that is at issue in this case.[5]

■ Congress has inherent authority to pass criminal laws which prohibit activity interfering with a federal interest. *See generally*, 1 RONALD D. ROTUNDA & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW, SUBSTANCE AND PROCEDURE § 4.10(c) (2d ed.1992). The permissible reach of federal criminal laws was seemingly boundless until the U.S. Supreme Court, in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), limited Congress' ability to transform an inherently intrastate activity into federal criminal activity. ROTUNDA & NOWAK, at Supp. § 4.10(c).

■ In *Lopez*, the Supreme Court reminded us that under our federal system, the " 'States possess primary authority for defining and enforcing criminal law.' " *Lo-*

*pez*, 514 U.S. at 561, n. 3, 115 S.Ct. 1624, quoting *Brecht v. Abrahamson*, 507 U.S. 619, 635, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (citation omitted). The Court also noted that when the federal government undertakes to criminalize conduct that the States already criminalize, it effects "a change in the sensitive relation between federal and state criminal jurisdiction." *Lopez*, 514 U.S. at 561, n. 3, 115 S.Ct. 1624 (citation omitted). With these principles in mind, the *Lopez* Court struck down the federal Gun–Free School Zones Act, 18 U.S.C. § 922, as an invalid exercise of Congress' power under the commerce clause. The breadth of the interstate commerce theories proffered by the government was of great concern to the Court:

> Under the theories that the Government presents in support of § 922(q), it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard-pressed to posit any activity that Congress is without power to regulate.

*Lopez*, 514 U.S. at 564, 115 S.Ct. 1624.

■ The Court found the statute to be an unconstitutional exercise of power because to hold otherwise "would require us to conclude that .... there will never be a distinction between what is truly national and what is truly local." *Id.* at 567–68, 115 S.Ct. 1624 (citations omitted). *Lopez* limited the reach of Congress' power to expand federal criminal jurisdiction based on the Commerce Clause. In doing so the Court refused "to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.* at 567, 115 S.Ct. 1624.[6] *Lo-*

---

5. Although the Government has suggested in argument that the first and second categories are also implicated, case law does not support that position. *See United States v. Hickman*, 179 F.3d 230, 232, 241–43 (5th Cir.1999)(en banc)(Higginbotham, J., dissenting), and cases cited therein.

6. The United States Constitution establishes a system of dual sovereignty. *Printz v. United States*, 521 U.S. 898, 918, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997); *Gregory v. Ashcroft*, 501 U.S. 452, 457, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). One hundred and thirty years

*pez* held that for Congress to prohibit non-commercial intrastate criminal activity, the Government must show that the conduct in question "substantially affects interstate commerce." *Id.* at 558–59, 115 S.Ct. 1624.

## B. Facial Challenge

■ In his motion to dismiss the indictment, Defendant first advances a facial challenge to RICO, 18 U.S.C. § 1961, and VCAR, 18 U.S.C. § 1959, arguing that the statutes are unconstitutional because they exceed Congress' authority to regulate interstate commerce. In the context of a facial challenge to a criminal statute, *Lopez* suggests that the substantial effects test may be satisfied when the statute contains a jurisdictional element which ensures, on a case-by-case inquiry, that the prohibited conduct affects interstate commerce. *Lopez,* 514 U.S. at 561, 115 S.Ct. 1624; *see also, United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); *United States v. Torres,* 129 F.3d 710, 717 (2nd Cir.1997); *United States v. Muyet,* 994 F.Supp. 501, 524 (S.D.N.Y. 1998); *United States v. Riley,* 985 F.Supp. 405, 408–09 (S.D.N.Y.1997). The *Lopez* Court specifically distinguished statutes which by their terms contain jurisdictional requirements, from the Act before them, which contained no such element. *Id.*

## 1. RICO

■ The language of the RICO statute contains a jurisdictional element:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering or collection of unlawful debt.

18 U.S.C. § 1962(c); *see also, Muyet,* 994 F.Supp. at 524.

The RICO statute penalizes conduct which directs or conducts an enterprise. The activities prohibited by 18 U.S.C. § 1962(a)-(c) include the acquisition, control, or conduct of the affairs of an enterprise. Each of the subsections of 18 U.S.C. § 1962 requires that the prohibited conduct must be carried out as part of the operation or control of an enterprise engaged in interstate commerce. For example, pursuant to 18 U.S.C. § 1962(c), it is unlawful for a person to participate in a pattern of racketeering activity in connection with "any enterprise which is engaged in interstate commerce." *Id.* Because RICO contains a jurisdictional element sufficient to meet the concerns expressed in *Lopez,* Defendant's facial challenge to the RICO statute must be rejected. *Robertson,* 514 U.S. at 671–72, 115 S.Ct. 1732.

## 2. VCAR

■ Unlike RICO, § 1959(a) punishes any act of violence committed by an indi-

ago, the Court explained the necessity of the dual system:

"'[T]he people of each State compose a State, having its own government, and endowed with all functions essential to separate and independent existence,' ... '[W]ithout the States in union, there could be no such political body as the United States.' Not only therefore, can there be no loss of separate and independent autonomy to the States, through their union under the Constitution, but it may be not unreasonably said that the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government. The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States."
*Texas v. White,* 7 Wall. 700, 725, 19 L.Ed. 227 (1868), quoting *Lane County v. Oregon,* 7 Wall. 71, 76, 19 L.Ed. 101 (1868).

It is well-established that the Constitution created a federal government of limited powers. This principle is embodied in the Tenth Amendment, which provides that, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. AMEND. X. As the Supreme Court has recently reminded us, "The States thus retain substantial sovereign authority under our constitutional system." *Gregory v. Ashcroft,* 501 U.S. 452, 457, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991).

vidual to maintain his status in an enterprise. The statute states in relevant part:

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished—for murder, by death or life imprisonment . . . .

18 U.S.C. § 1959(a)(1).

Even though the definition of "enterprise" in 18 U.S.C. § 1959(b)(2) includes an interstate commerce element,[7] the statute makes murder and other enumerated violent acts federal offenses if committed "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity" without requiring any relationship between a prohibited act of murder or other violent act and interstate commerce. Racketeering activity is defined in § 1959 by reference to 18 U.S.C. § 1961(1), the RICO statute, to include "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter or dealing in a controlled substance—which is chargeable under state law . . . ." By definition, state

offenses listed in § 1961(1) do not include an interstate component.

Beyond the nexus of the individual to the enterprise, § 1959 requires no other relationship to commerce. It does not require that the violent act affect commerce, nor that any conduct of the defendant affect commerce, nor anything other than that the enterprise be engaged in or affect commerce and that the defendant have a nexus with the enterprise. Although the tenuous jurisdictional element in VCAR may be sufficient to permit the statute to withstand a facial challenge,[8] the Court must evaluate the jurisdictional facts with more scrutiny in deciding whether VCAR is unconstitutional as applied. *See, e.g., United States v. Pappadopoulos,* 64 F.3d 522, 526–27 (9th Cir.1995).

### C. As–Applied Challenge

#### 1. RICO: *De Minimis* Connection to Commerce

The Defendant also challenges the constitutionality of the RICO and VCAR statutes as applied in this case. Prior to *Lopez,* it was clear that where a criminal statute contains a jurisdictional element, the effect on interstate commerce need only be *de minimis* in order to support a violation. *United States v. Robinson,* 763 F.2d 778, 781 (6th Cir.1985). In some contexts, particularly involving statutes where the activity is considered by the courts to be more intrinsically interstate, the *de minimis* requirement appears to apply in the wake of *Lopez* as well. For example, in upholding the Hobbs Act, 18 U.S.C. § 1951(a), in the face of a *Lopez* challenge, the Eleventh Circuit stated:

---

**7.** Section 1959(b)(2) defines "enterprise" to include "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2).

**8.** *See United States v. Riley,* 985 F.Supp. 405 (S.D.N.Y.1997), rejecting a facial challenge to VCAR. *Riley* held that the legislative history of § 1959 established that Congress rationally

> determined that § 1959 prohibits conduct that, when viewed in the aggregate, has a substantial effect on interstate commerce. This line of reasoning, supplemented by the Court's analysis of the jurisdictional nexus with the enterprise required by § 1959, supports the holding that § 1959 is not unconstitutional on its face, but the Court is not relieved from making specific factual findings which relate to the statute as applied.

[T]he Hobbs Act contains a jurisdictional element. *See* 18 U.S.C. § 1951(a) ("in any way or degree obstructs, delays, or affects commerce or the movements of any article or commodity in commerce"). It is this jurisdictional element of the Hobbs Act that defeats [the defendant's] *Lopez* challenge. Unlike the statute involved in *Lopez*, the Hobbs Act contains a jurisdictional requirement that the extortion be connected in any way to interstate commerce. Because the Hobbs Act contains the jurisdictional element, we continue to hold that the Government only needs to establish a minimal effect on interstate commerce to support a violation of the Hobbs Act.

*United States v. Castleberry*, 116 F.3d 1384, 1387 (11th Cir.1997).

Explaining the importance of the jurisdictional element and the need to define its parameters in federal commerce clause cases, the Ninth Circuit stated in *U.S. v. Pappadopoulos*, 64 F.3d 522, 526–27 (1995):

Many federal statutes that regulate activities that have traditionally been matters of purely local or state concern seek to limit their reach to constitutional bounds by requiring case-by-case determinations that a connection to interstate commerce exists. In reviewing a conviction under a federal criminal law that contains a jurisdictional element, we usually must determine not whether Congress constitutionally could have enacted such a statute, but whether the jurisdictional element provided by Congress to ensure the constitutional application of the statute has been met. In making such determinations, we are frequently asked to decide just how significant the contacts to interstate commerce must be.

The Court then reiterated that *Lopez* requires that connections to or effects on

interstate commerce must be "substantial." *Id.*

While the Sixth Circuit has, in the wake of *Lopez*, adopted the *de minimus* test in the context of the Hobbs Act, *United States v. Ables*, 167 F.3d 1021 (6th Cir. 1999), which regulates activities inherently affecting interstate commerce, such as money laundering and gambling, it has not yet considered the effect of *Lopez* on RICO and VCAR which often involve more local or intrastate activities such as murder and assault. The Sixth Circuit has, however, upheld a Commerce Clause challenge to § 1955, which prohibits illegal gambling. In doing so, the Court noted that § 1955 " 'contains no jurisdictional element which would ensure, through case-by-case inquiry,' that the gambling operation in question affects interstate commerce." *United States v. Wall*, 92 F.3d 1444, 1450 (6th Cir.1996), quoting *Lopez*. The court then added a footnote, which alluded to statutes that do contain jurisdictional elements. "Courts have required a low threshold of proof of interstate relation for these statutes." *Wall*, 92 F.3d at 1450, n. 13 (citation omitted).

Since *Lopez*, there has been limited litigation challenging the sufficiency of jurisdictional contacts in RICO and VCAR prosecutions. In *United States v. Gray*, 137 F.3d 765, 773 (4th Cir.1998), a case involving murder related to drug trafficking, the Fourth Circuit Court of Appeals held that minimal contacts were established by the movement of opiates in interstate commerce. *Id.* at 767, 769.

The United State Supreme Court also considered a RICO violation post-*Lopez*, but did not reach the issue of whether the government would be required to prove a substantial effect on interstate commerce. *United States v. Robertson*, 514 U.S. 669, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995).[9]

---

**9.** *Robertson* involved a partnership agreement to finance a gold mining operation in Alaska. There were numerous interstate commerce connections. For example, the defendant,

who resided in Arizona made payments of over two hundred thousand dollars for placer gold mining claims near Fairbanks and for equipment and supplies related to the mine

Given that RICO contains a jurisdictional element, and given the direction signaled in *Ables* and *Wall,* this Court concludes that a *de minimus* showing of impact on interstate commerce is all that is required to establish federal jurisdiction under RICO. The government has met this burden.

### 2. VCAR: Substantial Effect

■ As described above, VCAR has no jurisdictional element which ties either the violent act or the conduct of the defendant to interstate commerce; the only jurisdictional element relates to the activities of the enterprise. Under *Lopez,* the weakness of this attenuated jurisdictional element demands that something more than a *de minimus* connection be established under § 1959.

■ In *Lopez,* the Court held that Congress could regulate a noncommercial intrastate activity under its commerce power if the activity had a *close and substantial effect* on, or relationship to, interstate commerce. *Lopez,* 514 U.S. at 558–59, 561–62, 115 S.Ct. 1624. The Court rejected the government's argument that crime in general has a negative effect on interstate commerce, and cautioned against piling "inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez,*

which were purchased in California and shipped to Alaska. The defendant hired numerous employees from outside Alaska to work at the mine, and the defendant personally transported gold out of the state. In determining that the gold mine fit the definition of an enterprise under RICO, the Court stated,

Whether or not these activities met (and whether or not, to bring the gold mine within the "affecting commerce" provision of RICO they would have to meet) the requirement of substantially affecting interstate commerce, they assuredly brought the gold mine within § 1962(a)'s alternative criterion of "any enterprise ... engaged in ... interstate or foreign commerce."

*Id.* at 671–72, 115 S.Ct. 1732, quoting 18 U.S.C. § 1962(a). *See also, Riley,* 985 F.Supp. at 409–10.

514 U.S. at 567, 115 S.Ct. 1624. Thus, for the federal government to assert that it has an interest in noncommercial intrastate activity, the government must show that the activity has a close and substantial effect on interstate commerce. *See, e.g., Id.* at 558, 115 S.Ct. 1624; *United States v. Pappadopoulos,* 64 F.3d 522, 526–27 (1995).[10]

■ Even if the Government proves beyond a reasonable doubt that Garcia murdered Evan Ison to enhance the power and authority of the Cash Flow Posse and his role within it, that murder is still, in the end, a street crime committed by a thug as part of a local turf war in southwest Detroit. That this enterprise may have the *de minimis* impact on interstate commerce required to sustain federal jurisdiction under RICO, does not support the conclusion that one can bootstrap a purely local street crime into a federal capital offense. A stronger and more substantial connection or impact on interstate commerce is required.

In this case, the enterprise's connection to interstate commerce is weak. The Government merely alleges that some of its members drove within the state on an interstate highway in order to commit acts of murder. It also alleges that the gun used in connection with Racketeering Act 11 of Count I may have crossed state lines. Members of the gang are alleged to have

10. Since *Lopez,* courts have been wary of federal indictments charging local crime. For example, in *United States v. Pappadopoulos,* 64 F.3d 522 (9th Cir.1995), the court accepted the defendant's as-applied challenge to the federal arson statute, holding that the government failed to demonstrate the requisite jurisdictional connection required to sustain federal jurisdiction. *Id.* at 528; *see also United States v. Denalli,* 73 F.3d 328, 329 (11th Cir.1996)(following *Pappadopoulos* and holding that arson of a residence did not satisfy jurisdictional requirement under the circumstances.); *United States v. Paredes,* 950 F.Supp. 584 (S.D.N.Y.1996)(dismissing indictment under the federal murder-for-hire statute, and holding that the use of an intrastate telephone pager was an insufficient interstate nexus to establish the jurisdictional threshold).

purchased a gun at a trade center with out-of-state customers. There is evidence that one gang member heard from a cellmate that a law enforcement officer had alluded to the possibility of Cash Flow Posse "cells" existing in other states. Finally, two gang members, in their plea colloquies, acknowledged discussing with outside parties law enforcement initiatives against the Cash Flow Posse, while on a trip to Mexico. There is no evidence that the activities of the Cash Flow Posse, brutish and tyrannical as they may have been, substantially affected interstate commerce, nor that the aggregate of these tenuous commerce connections can be defined in any meaningful way as substantial. In the end, the Government is left only with an argument specifically rejected by *Lopez*— that the cumulative effect of violent crime in and of itself substantially affects commerce. As the Court observed in *Lopez:* "[I]f we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate." *Lopez,* 514 U.S. at 564, 115 S.Ct. 1624.

■■■■■■■ Defendant Garcia's individual connection is even weaker. The indictment does not allege that Garcia drove on I-94, or that he had anything to do with the Gibraltar Trade Center. The indict-

ment does not suggest that he made calls out of state, or that the gun with interstate connections was used by him in connection with the count for which the government seeks the death penalty.[11] The act of murder which is the basis for Count IV was a local shooting—a despicable act, but one with no interstate connection whatsoever. And although the court in *U.S. v. Riley* rejected a jurisdictional challenge based on the individual activities charged under § 1959, relying instead on the nexus with the enterprise and the findings of aggregate impact referred to in the legislative history, this analysis can push too far against the strictures of *Lopez.* The court in *Lopez* admonished that the "combined effect" argument "may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *Lopez,* 514 U.S. at 557, 115 S.Ct. 1624, quoting *N.L.R.B. v. Jones & Laughlin Steel Corp.,* 301 U.S. 1 at 37, 57 S.Ct. 615, 81 L.Ed. 893 (1937).[12]

## V. Conclusion

Being fully advised in the premises, having heard argument, having read the

---

**11.** The gun was allegedly used to commit Racketeering Act 11 of Count I wherein Garcia is charged with having conspired to murder rival gang members and to have assaulted Ronald Wells, Jeffrey Baker, and Joel Wood.

**12.** In a number of recent rulings, the U.S. Supreme Court has reaffirmed many of these principles of dual sovereignty. *See, e.g., Alden v. Maine,* — U.S. —, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999)(Congress cannot subject state to suit in state court without state's consent); *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board,* — U.S. —, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999)(sovereign immunity not abrogated by Trademark Remedy Clarification Act, nor voluntarily waived by state's activities in interstate commerce); *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank,* — U.S. —, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999)(neither Commerce Clause nor Patent Clause gave Congress the authority to abrogate state sovereign immuni-

ty in Patent and Plant Variety Protection Remedy Clarification Act); *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)(Religious Freedom Reformation Act held unconstitutional as a violation of Congress' power under Fourteenth Amendment); *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)(Congress lacks authority under the Indian Commerce Clause to abrogate the states' Eleventh Amendment immunity).

One common principle that can be inferred from these recent decisions is that the States retain "a residuary and inviolable sovereignty," *Alden v. Maine,* — U.S. —, 119 S.Ct. 2240, 2247, 144 L.Ed.2d 636 (1999), and that far-reaching though Congress' power may be, its use of that power must not "contradict[ ] vital principles necessary to maintain separation of powers and the federal balance." *City of Boerne v. Flores,* 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). "Al-

pleadings, and for the reasons set forth above, the Court hereby orders as follows:

Defendant's challenge to federal jurisdiction under RICO, the statutory basis for Counts I and II, is denied both on its face and as applied. Defendant's motion to dismiss Counts I and II of the Third Superseding Indictment is DENIED. With respect to Counts III and IV, however, the jurisdictional facts alleged by the government are insufficient to withstand an as-applied challenge to the federal statute which prohibits violent crimes in aid of racketeering activity, 18 U.S.C. § 1959. The application of VCAR to Defendant Garcia exceeds Congress' power under the Commerce Clause. Counts III and IV of the Third Superceding Indictment are DISMISSED.

SO ORDERED.

though the Constitution grants broad powers to Congress, our federalism requires that Congress treat the States in a manner consistent with their status as residuary sovereigns and joint participants in the governance of the Nation." *Alden,* —— U.S. at ——, 119 S.Ct. at 2263.

In this connection it is interesting to note that Michigan has a constitutional prohibition against the imposition of the death penalty. MICH. CONST. art. IV, § 46.