_____

No. 95-3021
_____

United States of America,        *
                                 *
        Appellee,                *
                                 *
    v.                           *
                                 *
Charles McMasters, Jr.,          *
                                 *
        Appellant.               *

_____
                                        Appeals from the United States
        No. 95-3023                     District Court for the
_____                             Southern District of Iowa.

United States of America,        *
                                 *
        Appellee,                *
                                 *
    v.                           *
                                 *
Reginald Arline,                 *
                                 *
        Appellant.               *

_____

        No. 95-3024
_____

United States of America,        *
                                 *
        Appellee,                *
                                 *
    v.                           *
                                 *
Steven Johnson,                  *
                                 *
        Appellant.               *

United States of America,　　　　　\*
　　　　　　　　　　　　　　　　　　\*
　　　　Appellee,　　　　　　　\*
　　　　　　　　　　　　　　　　　　\*
　　　v.　　　　　　　　　　　\*
　　　　　　　　　　　　　　　　　　\*
Jimmy Foley,　　　　　　　　　\*
　　　　　　　　　　　　　　　　　　\*
　　　　Appellant.　　　　　　\*

Submitted:　February 16, 1996

Filed:　August 2, 1996

Before WOLLMAN, HEANEY, and MAGILL, Circuit Judges.

MAGILL, Circuit Judge.

　　　Charles McMasters, Jr., Reginald Arline, Steven Johnson, and Jimmy Foley (defendants) were convicted following a jury trial in the district court[1] of conspiracy to distribute marijuana and cocaine base in violation of 21 U.S.C. § 846, conspiracy to commit arson in violation of 18 U.S.C. § 371, carrying a destructive device during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1), and carrying a destructive device during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1). Foley was also convicted of carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1). Defendants appeal their convictions, arguing that there was no federal jurisdiction to convict them for conspiracy to commit arson because of an insufficient connection to

---

[1]The Honorable Harold D. Vietor, United States District Judge for the Southern District of Iowa.

interstate commerce, that there was insufficient evidence to convict them of a conspiracy to distribute cocaine base, that their convictions for conspiracy to commit arson and for using and carrying a destructive device during and in relation to a crime of violence and during a drug trafficking crime were duplicative, and that the district court abused its discretion in dismissing a juror and in issuing two jury instructions. McMasters also argues that the district court abused its discretion in denying him a continuance. We affirm.

## I.

At 3:20 a.m. on Monday, August 1, 1994, a bomb exploded in the driveway of a house at 635 Eighth Avenue South in Clinton, Iowa, destroying two unoccupied vehicles. A second bomb was thrown through the living room window of the residence, but failed to detonate. Ulysses Burns, a purported drug dealer, his girlfriend, who was renting the house, and three small children were asleep in the living room when the bomb was thrown into the house.

Following an investigation, police arrested the defendants in connection with the bombing and for a related drug conspiracy. According to testimony at trial, the defendants, who were allegedly members of the Gangster Disciples gang, were engaged in the business of marijuana distribution and were beginning to branch out into cocaine base distribution. Defendants had targeted Burns for assassination because, as a rival drug dealer, he had refused to pay them a "tax" on illegal drug sales. In late July 1994 Foley, while the other defendants and other gang members watched, constructed three pipe bombs. The bombs were constructed from lengths of pipe purchased by McMasters and Foley on July 27, 1994, from smokeless gunpowder stolen during a burglary of a private home on June 28, 1994, and from lengths of fuse purchased at McMasters' request. To test the bomb design, McMasters, Foley, and other gang members detonated one of the bombs outside of town.

Prior to the actual bombing, the defendants made an aborted attempt to bomb Burns's residence. McMasters, Arline, and Johnson went to Chicago to have an alibi. Foley, carrying a handgun, and two other gang members went to Burns's residence to carry out the bombing. One of Foley's associates refused to complete the bombing, however, and the group retreated. The other defendants returned from Chicago the next day. There was no witness testimony as to who ultimately bombed Burns's residence.

The defendants were indicted by a grand jury on counts of conspiracy to distribute marijuana in violation of 21 U.S.C. § 846, conspiracy to distribute cocaine base in violation of 21 U.S.C. § 846, conspiracy to commit arson in violation of 18 U.S.C. § 371, carrying a destructive device during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1), and carrying a destructive device during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1). Foley was also indicted on a count of carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1). The defendants, represented by public defenders, pled not guilty to all charges, and the case was scheduled for a jury trial.

Several days prior to trial McMasters, who had retained private counsel, sought a continuance of the trial date so that his attorney would have time to prepare for trial. The district court denied the continuance, and McMasters was represented by a public defender during trial. On the last day of trial, the jury panel's sole African-American became ill. Over the defendants' objections, the court dismissed the juror, and replaced her with an alternate.

The defendants were convicted on all counts[2] and were sentenced by the court at a subsequent sentencing hearing. McMasters received a sentence of 423 months, Arline received a sentence of 430 months, Johnson received a sentence of 444 months, and Foley received a sentence of 477 months. The defendants were also ordered to pay special assessment costs and restitution and, following their prison sentences, to serve five years of supervised release. Defendants now appeal their convictions.

## II.

Defendants were convicted under 18 U.S.C. § 371 for conspiracy to commit arson, a violation of 18 U.S.C. § 844(i).[3] Relying on United States v. Lopez, 115 S. Ct. 1624 (1995), defendants argue on appeal that § 844(i) is facially unconstitutional because it is beyond Congress's Commerce Clause authority. We review de novo the constitutional challenge of a statute. See United States v. Bates, 77 F.3d 1101, 1104 (8th Cir. 1996).

In Lopez, the Supreme Court held that the Gun Free School Zones Act, 18 U.S.C. § 922(q), exceeded Congress's authority under

---

[2]Although the defendants had been indicted on separate counts of conspiracy to distribute marijuana in violation of 21 U.S.C. § 846 (Count 1) and conspiracy to distribute cocaine base in violation of 21 U.S.C. § 846 (Count 2), the district court concluded that "[t]he evidence established, and the government concedes, that Counts 1 and 2 charged defendants with the same conspiracy, a single conspiracy to distribute both marijuana and cocaine base." Record at 12. Because of this, the district court held that "the judgment of this case will reflect a conviction of one crime, not two, in respect to Counts 1 and 2." Id.

[3]18 U.S.C. § 844(i) provides penalties for:

Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce . . . .

the Commerce Clause. The Court noted that, under its commerce power, Congress may: (1) regulate the use of the channels of interstate commerce; (2) regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though a threat may come only from intrastate activities; (3) regulate those activities that substantially affect interstate commerce. See Lopez, 115 S. Ct. at 1629-30. The Court briefly concluded that the activity regulated by the statute, possession of guns within 1000 feet of a school, did not fit either of the first two categories, and focused its analysis on the third category.

The Lopez Court concluded that the statute could not "be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." Id. at 1631. The Court noted that the statute contained "no jurisdictional element which would ensure, through case-by-case inquiry, that the [activity] in question affects interstate commerce," id. at 1631, and that Congress had made no legislative findings that the activity so affected interstate commerce. See id. at 1631-32. Without a more definite connection to interstate commerce, upholding the statute would allow Congress to "regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce," id. at 1632, which exceeded the proper limits of the federal government's power.

Unlike the statute at issue in Lopez, 18 U.S.C. § 844(i) does contain a requirement that property be "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce . . . ." In addition, the legislative history of § 844(i) reflects Congress's concern that it not exceed its Commerce Clause authority, and Congress's determination that the statute was necessary to protect interstate commerce. See 116 Cong. Rec.

-6-

35198, 35359 (1970), <u>quoted in</u> <u>Russell v. United States</u>, 471 U.S. 858, 861-62, n.9 (1985).  Finally, it is clear that Congress has authority to protect those buildings which are the situs of "commercial transaction[s], which viewed in the aggregate, substantially affects interstate commerce." <u>Lopez</u>, 115 S. Ct. at 1631.  Although the applicability of § 844(i) in various circumstances may be "threaten[ed by] legal uncertainty," <u>Lopez</u>, 115 S. Ct. at 1664 (Breyer, J., dissenting), we conclude that § 844(i) on its face is constitutional.  <u>See</u> <u>United States v. Sherlin</u>, 67 F.3d 1208, 1214 (6th Cir. 1995) (under <u>Lopez</u>, Congress did not exceed its Commerce Clause authority in enacting § 844(i)) (arson of a college dormitory), <u>cert. denied</u>, 116 S. Ct. 795 (1996).

Defendants contend that, even if facially constitutional, § 844(i) could not be constitutionally applied in this case because the object of the arson conspiracy was a private residence and was thus not in the stream of interstate commerce.  We disagree.  Burns's residence was a rental unit which received some utilities from out-of-state.  Unlike the possession of a firearm at issue in <u>Lopez</u>, rental real estate represents an ongoing commercial enterprise, which frequently has interstate connections.  There is little question that Congress may regulate other aspects of residential rental real estate, <u>see, e.g.</u>, the Fair Housing Act, 42 U.S.C. §§ 3601-3631 (discrimination in housing).  In <u>Russell v. United States</u>, 471 U.S. 858 (1985), a unanimous Supreme Court held that § 844(i) could be constitutionally applied to the arson of an apartment building, noting that "the statute only applies to property that is 'used' in an 'activity' that affects commerce.  The rental of real estate is unquestionably such an activity."  <u>Id.</u> at 862.

The <u>Russell</u> decision has not been formally overruled, and in <u>United States v. Martin</u>, 63 F.3d 1422 (7th Cir. 1995), the Seventh Circuit, although noting the decision in <u>Lopez</u>, relied on <u>Russell</u>

in holding that rental real estate constitutes an interstate commerce activity for § 844(i). Martin, 63 F.3d at 1426-28. The cases relied on by defendants, United States v. Pappadopoulos, 64 F.3d 522, 527-28 (9th Cir. 1995) (holding that out-of-state source for natural gas was an insufficient nexus to interstate commerce to allow prosecution under 18 U.S.C. § 844(i) for arson of a private home), and United States v. Denalli, 73 F.3d 328, 330-31 (11th Cir. 1996) (per curiam) (holding that occasional use of home computer for business purpose was an insufficient nexus to interstate commerce to allow prosecution under § 844(i) for arson of private home), are not inapposite. These cases did not involve rental property, nor did they suggest that Russell is no longer good law.

We do not believe that Lopez overruled Russell sub silentio; it is possible, however, that Lopez limited the reach of § 844(i) by articulating a more stringent standard. If the rented house falls within the reach of Congress's Commerce Clause powers, it must have been used in an activity substantially affecting interstate commerce. See Lopez, 115 S. Ct. at 1630. We hold that the rental status of Burns's residence provided the necessary nexus to interstate commerce for federal jurisdiction over the defendants' conspiracy to commit arson. In other words, renting a house is the sort of economic activity that might, through repetition elsewhere, substantially affect interstate commerce. See id. at 1634. Therefore, the defendants' convictions for this crime were constitutional exercises of federal authority.

## III.

Defendants argue that there was insufficient evidence to convict them of conspiring to distribute cocaine base. In reviewing the sufficiency of the evidence in a criminal case, we will uphold a jury finding of guilt if, taking the evidence in the light most favorable to the verdict, a reasonable juror could have found the defendants guilty beyond a reasonable doubt. See United

States v. Tran, 16 F.3d 897, 903 (8th Cir. 1994).

To convict defendants of conspiracy, the government had to prove (1) that a conspiracy existed; (2) that the defendants knew of the conspiracy; and (3) that the defendants knowingly became a part of the conspiracy. See United States v. Robbins, 21 F.3d 297, 299 (8th Cir. 1994). "Once a conspiracy is established, even slight evidence connecting a defendant to the conspiracy may be sufficient to prove the defendant's involvement." Id. (quotations omitted).

Gang member Terry Steven Clark provided significant testimony regarding the alleged conspiracy. Clark testified that he observed cocaine powder, supplied by McMasters, being transformed into cocaine base. See Trial Tr. at 528-29. Clark also stated that Arline and Johnson were "dealing" drugs for McMasters and Foley, and "were getting their stuff through the same source. They were getting their stuff from Jim [Foley] and Chuck [McMasters]." Id. at 460. When asked if he was "present on any times when Steven Johnson or Reginald Arline obtained marijuana from Chuck [McMasters]," id., Clark stated:

> A. Right. Yeah, they lived in a house at 2103 North Second Street, and I had kept a lot of stuff in my house. I kept pounds of dope. We had lots of rocks and coke in there.
>
> One time I seen Chuck [McMasters] give a bag of 10 rocks to Silk [Arline] and giving it to him at my house up there, and I seen him giving it to them.

Id. at 460-61. Although Clark stated that he did not see Foley distribute cocaine base to Johnson or Arline, id., he did describe Foley's other involvements with the alleged conspiracy:

> Q. Were you [Clark] present on any occasions that crack cocaine supplies arrived?

A.   One time Trent [Schumpert], the governor of this group--
he's the top leader of our group in Clinton.   He had just
gotten there at Jim[ Foley]'s house, and I had seen 10 sacks of
rocks--that's rock cocaine--and I also seen five pounds of pot
and four ounces of coke. . . .   They [rocks of cocaine base]
were in 10-10 sacks [100 rocks], and they would be distributed,
you know, at one rock at a time for $30.

. . . .

Q.   . . . Were you ever involved in bringing in a shipment of
either marijuana or crack?

A.   The closest I got to involved with bringing in one was
when I went to Chicago with Chuck [McMasters] and Jim [Foley].
The purpose was to go up there because we had been dry, which
means we haven't had any drugs for like about a week and a
half, and they were getting antsy, so I took them up to
Chicago, to Trent's house, to get it.

Id. at 465-66.   Clark testified that, following the trip to Chicago, he
observed Foley and McMasters in possession of "a couple of ounces of coke."
Id. at 469.

Clark testified that defendants planned to increase their
distribution of cocaine base, stating that, "Chuck [McMasters] was arguing
about something, about me not selling the rocks fast enough, so he only
gave us two pounds [of marijuana] instead of five, so that way we pushed
the rocks a little faster."  Id. at 470.  Clark testified that he and other
gang members were to "open up the corner" on Ninth Street to expand on
crack sales:

Q.   All right.  Now, when you say open up the corner, what do
you mean by that?

A.   Make it to where everybody knew where it was at, where it
could be found, and then distribute it real easy, the rock.

. . . .

Q.   And did you have any discussions with Chuck [McMasters]
or Jim [Foley] or Silk [Arline] or Baby G [Johnson] about what
you needed to do to open up a new

-10-

area?  I guess were you party to any discussions, not necessarily were you initiating discussions, but was it something discussed about doing it or how to go about it or what you were going to do or what the concern was?

A.    All right, yes.  Down there, you know, we had to figure-- we figured we would get a little trouble, so they planned that we would go down there, and hidden in a rock nearby, there was a gun there in case there was trouble.  We always discussed security.  We always had people walking up and down the street making sure there wasn't a cop watching you around the corner. If there was a cop, everybody would hide everything in case the cop came and searched us, and that's how we opened it up, to make sure everything was safe.

Q.    Who developed these plans or approaches?  Who decided "this is how we're going to do it"?

A.    Jim [Foley] decided on the security, making sure the guns were there, you know.  Chuck [McMasters] initiated that we had to sell it, you know, we would have to get rid of this, and he made sure there was always people down there . . . .

Id. at 471-72.  Clark went on to describe how McMasters ensured the cooperation of young children in the cocaine base sales, see id. at 473 (McMasters "made sure everybody was spending time down there . . . . Little Raymond, he's around 12; Blue coat is around 13 or 14, I think.  They're pretty young.  And Hector, he's around 11 or 12, and most of the time we would give them the rocks to hang onto and put in their pockets, because they would be one of the last to get searched."), and McMasters's, Arline's, and Johnson's roles as armed guards against rival drug dealers. See id. at 475 ("Chuck [McMasters] and Silk [Arline] and Baby G [Johnson] and KeKe [Bryant] and all of them guys were down with guns.  They brought their guns down. . . . They were just waiting a couple of blocks--waiting for someone to come out, and if they came out, they would come out shooting and protect us.").

In addition to Clark's testimony, Brandon Still testified that he purchased rocks of cocaine base from McMasters on two occasions.

See Trial Tr. at 910-12, 916-18.  The cocaine base allegedly purchased from McMasters was entered into evidence at trial.  Id. at 915, 918.  Finally, Randy Bell, who allegedly sold drugs for the gang, testified that he and other members of the gang were "asked to go into new parts of town where the crack sales was more the thing than marijuana," Trial Tr. at 736, where he encountered "other people who were not part of [the Gangster Disciple] group that were also out there selling crack . . . ."  Id.

According to the witnesses at trial, therefore, the gang as an entity was in the business of distributing cocaine base.  McMasters prepared, transported, and sold cocaine base, and supervised others in its distribution.  Foley supervised security during the distribution of the cocaine base.  Arline sold the cocaine base given him by McMasters, and Johnson, who was also a drug seller, acted as an armed guard.  Defendants contend that these witnesses were unreliable because they were accomplices who had been granted immunity, and that the jury could therefore not have reasonably believed them.  We disagree.  The decision whether to believe a witness is uniquely the province of the jury; "[w]e do not judge the credibility of witnesses."  United States v. Hankins, 931 F.2d 1256, 1258-59 (8th Cir.), cert. denied, 502 U.S. 886 (1991).  We conclude that, relying on the testimony of these witnesses, a reasonable jury could find beyond a reasonable doubt that a conspiracy to distribute cocaine base in fact existed, and that each of the defendants were active, knowing, and voluntary participants in the conspiracy to distribute cocaine base.  See Robbins, 21 F.3d at 299.

## IV.

Defendants contend that their convictions for conspiracy to commit arson and for using and carrying a destructive device during and in relation to a crime of violence and in relation to a drug trafficking crime were duplicative, and therefore violative of the

Fifth Amendment's Double Jeopardy clause, because they involved the same explosive device. We review a double jeopardy claim de novo. See United States v. Bennett, 44 F.3d 1364, 1369 (8th Cir.), cert. denied, 116 S. Ct. 98 (1995).

"The double jeopardy clause protects [defendants] against, among other things, multiple punishments for the same offense--unless there is a clear indication of contrary legislative intent." United States v. Jones, 34 F.3d 596, 601 (8th Cir. 1994) (citations and quotations omitted), cert. denied, 115 S. Ct. 1701 (1995). Where we are faced only with cumulative sentences imposed in a single trial for the same conduct,

> the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended. Further, where Congress specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct . . . the trial court or jury may impose cumulative punishment under such statutes in a single trial.

United States v. Halford, 948 F.2d 1054, 1056 (8th Cir. 1991) (quotations omitted, ellipsis in original), cert. denied, 503 U.S. 996 (1992).

The defendants were properly convicted for both a violation of 18 U.S.C. § 924(c) and for conspiracy to commit arson. Section 924(c) provides that

> Whoever, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years, and if the firearm is . . . a destructive device . . . to imprisonment for thirty years. . . .

Because § 924(c) "applies even where another criminal statute provides for enhanced punishment for using a weapon, Congress [has] clearly authorized the cumulative punishment." Halford, 948 F.2d at 1056. Thus, "the imposition of the [30]-year mandatory sentence under the Firearms Act [18 U.S.C. § 924(c)] in addition to the sentence for the underlying crime of violence or drug-trafficking crime does not constitute double jeopardy." Jones, 34 F.3d at 601.[4]

**V.**

Finally, the defendants contend that the district court abused its discretion in making several rulings during the course of trial. Most significantly, the defendants argue that the district court abused its discretion in dismissing juror Lewis, the jury panel's sole minority member.

During voir dire, the district court disallowed a government peremptory strike of Lewis, the jury panel's only African-American, citing Batson v. Kentucky, 476 U.S. 79 (1986). On the evening of Thursday, April 6, 1995, Lewis became ill, and sought help at an

---

[4]In any event, we note that there can be no double jeopardy claim for multiple indictments for the same conduct if each charge "'requires proof of a fact which the other does not.'" Ball v. United States, 470 U.S. 856, 861 (1985) (quoting Blockburger v. United States, 284 U.S. 299, 304 (1932)). A conviction under 18 U.S.C. § 924(c) requires proof that the defendant used or carried a firearm, including a destructive device, "during and in relation to any crime of violence or drug trafficking crime." By contrast, "[c]onspiracy to commit arson requires that two or more individuals plan to use fire [or explosives] in maliciously destroying or damaging a building used in interstate commerce and one or more of the conspirators must perform an act to further the object of the conspiracy. 18 U.S.C. §§ 371 and 844(i). The actual use of fire [or an explosive device] is not a requirement of the statute." United States v. Riggio, 70 F.3d 336, 338 n.11 (5th Cir. 1995), cert. denied, 116 S. Ct. 1366 (1996). Because the government had to prove different facts to secure convictions under § 924(c) and § 371, there could be no double jeopardy bar in this case.

-14-

emergency room.  On April 7, 1995, the fourth, and what was to be the final, day of trial, the district court, noting that Lewis "must see her personal physician today, and she didn't sound very good at all," Trial Tr. at 787, dismissed Lewis and placed an alternate on the jury panel.  In so doing, the district court expressed a concern for trial expediency and consideration for the scheduled witnesses.

Responding to defendants' in-chambers argument that <u>Batson</u> supported a continuance rather than the dismissal of the jury's sole African-American, the district court stated:

> <u>Batson</u> doesn't say that there's a need--a requirement to have different races represented on the jury. . . .  [<u>Batson</u>] holds that you cannot exercise a [peremptory] challenge on a juror because of their race.  That's what <u>Batson</u> holds, and I don't understand <u>Batson</u> to establish different standards for determining when an active juror should be discharged and replaced with an alternate juror at all, so I don't think that <u>Batson</u> is offended by what I did here this morning.

Trial Tr. at 792-93.

Defendants seem to argue that the district court's discretion should be more limited when dismissing a jury panel's sole African-American than when dismissing any other juror.  We agree with the district court that <u>Batson</u> does not mandate differing standards for the dismissal of jurors based on their race; indeed, it requires just the opposite.  <u>See</u> <u>Batson</u>, 476 U.S. at 85 (describing "the Court's unceasing efforts to eradicate racial discrimination in the procedures used" to select juries).[5]  The sole

---

[5]In explaining its reasons for dismissing Lewis, the district court stated:

> The practice I followed this morning when I excused the juror after I personally spoke with her . . . is the same practice I have consistently employed throughout the years in a situation like this where a juror calls in ill. . . . I did that without regard to race one way or the other.  It's precisely what I would have done if it had been one of the 11 white jurors who called in ill.  I would have, under the same circumstances, excused that juror and activated the first alternate juror.

issue is whether the

---

Trial Tr. at 791-92.  Defendants do not claim, and we agree that "there would be no basis for any such claim, that Judge Vietor's handling of Juror Lewis was in any manner racially motivated."  Br. of Appellant Arline at 12.

district court properly removed an ill juror. "The decision of whether or not to remove a juror is normally vested in the wise discretion of the trial court. If the record shows a legitimate basis for his decision, there is no abuse of that discretion." United States v. Key, 717 F.2d 1206, 1209 (8th Cir. 1983) (per curiam). While "a reasonable delay in the interest of the ultimate goal of justice is often the most prudent choice," Rush v. Smith, 56 F.3d 918, 921 n.1 (8th Cir. 1995) (en banc), cert. denied, 116 S. Ct. 409 (1995), the district court is in the best position to determine whether a delay will, under the specific circumstances of a given case, be reasonable. We believe that the district court stated a legitimate basis for its decision to dismiss Lewis from the jury panel, and therefore did not abuse its discretion.

An extended discussion of the defendants' remaining points is unnecessary. See 8th Cir. R. 47(b). The district court did not abuse its discretion in denying a continuance to McMasters, who had retained new counsel immediately prior to the scheduled trial date. Similarly, the district court did not abuse its discretion in issuing an instruction on accomplice testimony patterned after Eighth Circuit Model Jury Instruction 4.05, rather than an instruction which advised the jury to exercise greater caution in considering accomplice testimony; we have specifically held "that no absolute and mandatory duty is imposed upon the trial court to advise the jury by instruction that they should consider the testimony of an uncorroborated accomplice with caution." United

States v. Schoenfeld, 867 F.2d 1059, 1062 (8th Cir. 1989) (per curiam). Finally, the district court did not abuse its discretion when it issued a jury instruction on the conspiracy to commit arson charge.  Cf. United States v. Martin, 63 F.3d 1422, 1428 n.2 (7th Cir. 1995) (noting that jury instruction, which stated that an "activity affecting interstate commerce" included "rental of an apartment building," correctly stated the law).

Accordingly, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.