UNITED STATES of America,
Plaintiff–Appellee,

v.

Robin G. LAMONT, Defendant–
Appellant.

No. 00–30220.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 3, 2003.

Filed June 9, 2003.

Terence M. Ryan, Spokane, WA, for the defendant-appellant.

Stephanie J. Lister, Assistant United States Attorney, United States Attorney's Office, Spokane, WA, for the plaintiff-appellee.

Before REINHARDT, W. FLETCHER, and GOULD, Circuit Judges.

## OPINION

REINHARDT, Circuit Judge.

Once again we are asked to delineate the appropriate scope of criminal law power as it is reposed within the federal government: this time, whether, under the general federal arson statute, setting fire to a church constitutes a federal offense. We hold that ordinarily it does not.

Appellant Robin Lamont entered a conditional guilty plea to committing arson with respect to the Subud church in Spokane, Washington. On appeal, Lamont argues that the application of the federal arson statute, 18 U.S.C. § 844(i), to the church represents an unconstitutional exercise of the Commerce Clause power.

Following the recent case of *Jones v. United States*, 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000), we hold that, as a matter of statutory construction, a building used as a church does not by virtue of that use qualify as property "used in" interstate commerce or in any activity affecting interstate commerce for purposes of § 844(i). Accordingly, we reverse the judgment of the district court with instructions to vacate the plea and dismiss the indictment.

## I. BACKGROUND

Shortly after midnight on July 1, 1999, the Spokane Valley Fire Department responded to a fire at the local Subud church.[1] The fire was reported by a Miss Jensen, who herself had been told of the fire by Lamont. No one was injured in the fire. Lamont, then eighteen years old, lived with his family one block away from the church. Lamont eventually confessed to setting the fire. In his confession, he stated that he did not start the fire out of

"hatered [sic] towards any body who went to that church," but "just for the rush."

Shortly thereafter, a federal grand jury indicted Lamont on one count of federal arson, 18 U.S.C. § 844(i). The statute provides, in relevant part, that:

Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property *used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce* shall be imprisoned for not less than 5 years and not more than 20 years....

18 U.S.C. § 844(i) (emphasis added). Lamont filed two separate motions to dismiss on Commerce Clause grounds, both of which the district court denied. On June 19, 2000, the district court accepted Lamont's conditional guilty plea, reserving the right to appeal his Commerce Clause Challenge. The plea agreement contains the following language pertinent to our analysis:

While the Defendant intends to appeal the jurisdictional issue regarding interstate commerce, the Government would be able to present evidence at the trial that SUBUD Pacific Northwest is a spiritualistic organization and serves members in Alaska, Washington, Oregon, Idaho and Montana. Furthermore, the Church receives its gas from the Alberta natural gas fields. The Church is also insured by an out of state company, Lloyds of London. The Church also purchases goods which originate from out of state. Additionally, since several of the Church's members are from out of state and various funds have been transferred between states and internationally. Finally, the Church does re-

---

1. Subud refers to a religious movement founded in Indonesia by Raden Mas Muhammad Subuh Sumohadiwidjojo in 1947. *See* Emmy Fitri, *On a Search for Soul Through Subud*, Jakarta Post, Mar. 24, 2002, at P7, *available at* 2002 WL 13909375.

ceive and distribute publications that travel interstate.

The district court sentenced Lamont to twenty-four months with credit for time served, to be followed by three years of supervised release. Lamont has served his sentence and is currently on supervised release. He appeals.

## II. DISCUSSION

### A. The Nature of Lamont's Challenge

■ Lamont argues that the application of the federal arson statute to a church with minimal or nonexistent interstate commerce connections exceeds Congress's Commerce Clause power. Before turning to the substance of his claim, we first consider in what manner we ought to resolve it. We must start from a "fundamental and longstanding principle of judicial restraint [that] requires [us to] avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). This principle means that "a decision on a constitutional question is appropriate only after addressing the statutory questions." *United States v. Odom*, 252 F.3d 1289, 1293 (11th Cir.2001). Here, our statutory analysis resolves the issue and there is thus no cause to reach the constitutional question.

Initially, we did not approach the federal arson statute in this manner. In *United States v. Pappadopoulos*, 64 F.3d 522 (9th Cir.1995), we considered, and ultimately accepted, the defendant's claim that § 844(i) did not apply to the arson of a private residence, but we did so only after analyzing the scope of the Commerce Clause. In *Pappadopoulos*, we stated that "whether a private residence is sufficiently connected to interstate commerce within the meaning of section 844(i) ... might appear to be solely a matter of statutory

construction." 64 F.3d at 525. We ultimately concluded, however, that "section 844(i) expresses an intent by Congress to exercise its full power under the Commerce Clause. Therefore, the question we must decide is whether Congress could constitutionally prohibit the destruction of the Pappadopoulos residence under the power vested in it by the Commerce Clause." *Id.* (citation omitted).

■ The Supreme Court subsequently rejected our interpretation of § 844(i). In *Jones v. United States*, 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000), the Court, in considering whether the federal arson statute applies to a private residence, disagreed with the assumption that in adopting the federal arson statute Congress intended to use its Commerce Clause power to the fullest extent. Rejecting the Government's view that the words "affecting ... commerce" "signal[ed] Congress' intent to invoke its full authority under the Commerce Clause," the Court observed that " § 844(i) contains the qualifying words'used in' a commerce-affecting activity," and that "the key word is 'used.'" *Id.* at 854, 120 S.Ct. 1904. " 'Congress did not define the crime described in § 844(i) as the explosion of a building whose damage or destruction might affect interstate commerce ....' " *Id.* (quoting *United States v. Mennuti*, 639 F.2d 107, 110 (2d Cir.1981)). The reach of the federal arson statute, then, is not coterminous with the outer limits of Congress's Commerce Clause power. Accordingly, we resolve Lamont's claim as a matter of statutory construction, and do not reach his constitutional challenge.

### B. The General Scope of the Federal Arson Statute

As a substantive matter, *Jones* determined that an owneroccupied residence not used for any commercial purpose did not

qualify as property "used in" any activity affecting interstate commerce, so as to be reached by § 844(i). Specifically, *Jones* set forth a two-part inquiry for ascertaining whether § 844(i) encompasses a particular building damaged by arson: first, a reviewing court examines "the function of the building itself, and then [determines] whether that function affects interstate commerce." *Id.* In *Jones*, the Court determined that the relevant facts purportedly tying the private residence damaged by arson to interstate commerce—including an out-of-state mortgage and insurance policy, as well as the receipt of natural gas from out-of-state—were insufficient to support a conviction under the statute. *Id.* at 855–56, 120 S.Ct. 1904. Rejecting the government's broad interpretation of the statute, *Jones* stated that under that view

> hardly a building in the land would fall outside the federal statute's domain. Practically every building in our cities, towns, and rural areas is constructed with supplies that have moved in interstate commerce, served by utilities that have an interstate connection, financed or insured by enterprises that do business across state lines, or bears some other trace of interstate commerce.

*Id.* at 857, 120 S.Ct. 1904. Citing the constitutional concerns present in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), *Jones* stated that "it is appropriate to avoid the constitutional question that would arise were we to read § 844(i) to render the 'traditionally local criminal conduct' in which petitioner Jones engaged 'a matter for federal enforcement.'" 529 U.S. at 858, 120 S.Ct. 1904 (quoting *United States v. Bass*, 404 U.S. 336, 350, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971)). Ultimately, *Jones* held that the statute did not cover the arson in question, that of an owner-occupied private residence. *Id.* at 859, 120 S.Ct. 1904.

Lamont argues that the federal arson statute does not apply to a church because churches in general, and the Subud church in Spokane in particular, are not, as the indictment alleges, "used in" interstate commerce or in activities affecting interstate commerce. We next discuss that question.

### C. The Application of the Federal Arson Statute to a Church

#### 1. General Principles

We approach our task of statutory interpretation in light of two factors that help determine the outcome. First, we afford a narrow scope to our construction of the arson statute's jurisdictional provision. As we pointed out earlier, when Congress enacted the statute it did not intend to employ its full Commerce Clause power. Second, because this is a criminal statute that covers a subject ordinarily within the traditional responsibility of the states, we presume that Congress intended to afford a particularly narrow scope to its terms.

The Supreme Court has recently spoken with unusual force regarding the need to reserve to the states the exercise of the police power in traditional criminal cases, *United States v. Morrison*, 529 U.S. 598, 618, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."), and the constitutional mandate to maintain "a distinction between what is truly national and what is truly local." *Lopez*, 514 U.S. at 567–68, 115 S.Ct. 1624 (citing *NLRB v. Jones & Laughlin Steel*, 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937)). As the Court emphasized in *Lopez*: "Our national government is one of delegated powers alone. Under our federal system the administration of criminal justice rests with the States except as Congress, acting within the scope of those

delegated powers, has created offenses against the United States." 514 U.S. at 561 n. 3, 115 S.Ct. 1624 (quoting *Screws v. United States*, 325 U.S. 91, 109, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (plurality)). Specifically, *Jones* emphasized that the federal arson statute was not meant "to make virtually every arson in the country a federal offense." 529 U.S. at 859, 120 S.Ct. 1904. "Jones specifically instructed that absent a clear message to the contrary, Congress will not be deemed to have changed the federal-state balance in the prosecution of crimes, and that *Lopez* should guide our construction of section 844(i)." *United States v. Rea*, 300 F.3d 952, 963 (8th Cir.2002). After all, "arson is a paradigmatic common-law state crime." *Jones*, 529 U.S. at 858, 120 S.Ct. 1904.

Examining the federal arson statute in this light and following the mode of analysis mandated by *Jones*, we first determine the nature of the functions performed in the Spokane Subud church building; second, we ascertain whether such activity affects interstate commerce. At the outset, however, we note the peculiarity of hunting for commerce in a house of worship.

2. *The Jurisdictional Element and the Stipulated Facts*

Initially, we observe that determining whether or not sufficient interstate commerce effects may be found provides the answer to the question whether, under the statute, federal jurisdiction for Lamont's prosecution exists. Section 844(i) contains an express jurisdictional element: a "provision in a federal statute that requires the government to establish specific facts justifying the exercise of federal jurisdiction in connection with any individual application of the statute." *United States v. Rodia*, 194 F.3d 465, 471 (3d Cir.1999); *see, e.g., United States v. Gaydos*, 108 F.3d 505, 508 (3d Cir.1997) (stating that § 844(i) "contains a jurisdictional element"); *United States v. Martin*, 63 F.3d 1422, 1427 (7th Cir.1995) (stating that the "rental [aspect of the property] is the interstate hook on which the government hung its [jurisdictional] argument").[2] In order to satisfy the jurisdictional element, the government argues that the stipulated facts are sufficient to establish a connection between the church and interstate commerce. They are: 1) that the Subud Pacific Northwest spiritual organization serves members in Alaska, Washington, Oregon, Idaho, and Montana; 2) that the Subud church receives its gas from the Alberta natural gas fields; 3) that the church is insured by an out-of-state company, Lloyds of London; 4) that the church also purchases goods that originate from out-of-state; 5) that several of the church's members are from out-of-state and that various funds have been transferred interstate and internationally; and 6) that the church receives and distributes publications that travel interstate. Whether these facts are sufficient to sustain a conviction under § 844(i) requires us to look first at the use or uses to which the building in question is put and then the relationship of those uses to interstate commerce.

To make the terms of our discussion clear, we differentiate among three separate, and potentially confusing, uses of the term "church." First, for purposes of this opinion, when we refer to a "church," we

---

**2.** *Cf. United States v. Rayborn*, 312 F.3d 229, 231 (6th Cir.2002) ("Although the interstate commerce requirement is frequently called the 'jurisdictional element,' it is simply one of the essential elements of § 844(i). It is not jurisdictional in the sense that it affects a court's subject matter jurisdiction, *i.e.*, a court's constitutional or statutory power to adjudicate a case."); *see also United States v. Denalli*, 73 F.3d 328, 329 (11th Cir.1996) ("The federal arson statute expressly requires a jurisdictional prerequisite as an essential element.").

do *not* refer to a general religious institution—such as the "Roman Catholic Church"—that may encompass multiple parcels of property and a massive membership in many states, and indeed in many nations around the world. Instead, our use of the term "church" encompasses two smaller but discrete meanings. One definition of church that is pertinent here is: the specific physical structure in which the local congregation conducts its worship. Another is: the local spiritual institution—the entity that has a local membership and a shared purpose among its members to practice, and to promote, a particular religion. In this opinion, we will refer to the first concept as a "building," or "church building," and to the second as a "church," so as to avoid unnecessary confusion. The difference is important for our statutory analysis. A church building may be put to particular uses, whereas a church (in the institutional sense) may not; the latter term refers to the religious entity itself. In discussing the application of the statute, however, we must consider both meanings. First, when we examine the uses to which a church building is put, and thus determine what, if any, activities are carried on in the building (whether by the church or others), we conduct a largely factual inquiry. Second, when we examine whether the activities in which a church engages "affect[ ] interstate commerce," we examine both the nature of a "church" generally, and the meaning of the statutory term, "interstate commerce," primarily legal questions.[3]

### 3. *The Function of the Building*

The Spokane Subud church building was used principally as a church. That is, the property was used by a religious entity as a home for its spiritual operations, and principally to provide a physical place of religious worship for its congregants. In this sense, the Spokane Subud building is like any other ordinary church building; it is used for religious purposes, and not for other activities of a commercial or economic character.

### 4. *The Effects of the Function on Interstate Commerce*

■ Under *Jones*, we next consider whether the function of a building used as a church affects interstate commerce, as that term is used in § 844(i). The text of the statute itself suggests two methods by which a building can fall within its scope. "[T]he commercial function of the property could directly inject it into the stream of interstate and/or foreign commerce[,] and/or the building's functions could cause it to be used in an activity affecting interstate commerce." *Rea*, 300 F.3d at 961. *Jones* only considered the second of these two possibilities. *See id.* We need not distinguish between the two in this case, for we conclude that, under either method, a church ordinarily has insufficient connections to interstate commerce for the statute to apply.

■ A church, like the owner-occupied residence considered in *Jones*, generally does not function in a manner that places it in any significant relationship with commerce, let alone interstate commerce. A church's primary function is essentially non-commercial and non-economic. *Rea*, 300 F.3d at 960 ("The fact that a building is a church, without more, ... does not bring it within the ambit of section 844(i)."). Indeed, a church's function and operations could not be further removed

---

**3.** We emphasize that when referring to a "church building," we refer to all structures meant for religious worship, including synagogues, other temples, and mosques. We use the term "church building," instead of the more awkward phrase "places of religious worship," out of convenience, and not for purposes of limiting our decision here to one particular religion or group of religions.

from what we ordinarily understand as commercial activity. The destruction of a church building may have economic consequences, but this does not lead to the conclusion that a church is inherently commercial. Churches do not exist, for example, for the purpose of commercial exchange, notwithstanding their solicitation of substantial amounts of funds that may be expended for national or even international proselytizing, or for the construction of sometimes extraordinarily costly edifices, which funds may be transmitted to national or international parent bodies for such purposes. Rather, the business of a church is to provide spiritual guidance, comfort, and charity to its members and to others who may wish to take advantage of its services.[4] Thus, churches, for purposes of construing the scope of a federal criminal statute, "are not commonly considered a business enterprise." *Odom*, 252 F.3d at 1294.

Some churches today have taken on functions that *may* be sufficiently unrelated to religious worship to warrant their inclusion within the jurisdictional scope of the criminal statute before us. *See* Brian Feagans, *Metro Atlanta's Megachurches: More Than a Place to Worship*, Atlanta J.-Const., Apr. 24, 2003, at JJ1, *available at* 2003 WL 19314994 (describing "mega-churches" offering banking, shopping, barbershop, and fitness center services). We need not, however, consider here whether churches that carry on such non-religious activities along with their traditional spiritual roles may thereby be said to be in interstate commerce, or whether the buildings they occupy may be said to be used for activities that affect interstate commerce for purposes of a federal criminal statute. Whether such activities will bring a church within the ambit of § 844(i) is not before us, and we express no view on the issues involved. In the case before us, it is enough to conclude that, for the purposes of the statute, the ordinary activities of a church do not affect interstate commerce, or indeed commerce at all.

Nor are the stipulated facts offered by the government sufficient to bring the Spokane Subud church within the reach of the statute. As an initial matter, we note that the factual stipulation at issue here is either deliberately or inartfully written so as to confuse the various meanings of "church" that we described earlier. At least one sentence of the facts offered by the government clearly refers to a national or regional institution, "SUBUD Pacific Northwest." Others relate to the local church building or the local church, as we have earlier defined those terms.[5] Fact

---

**4.** Church buildings, like owner-occupied homes, are not primarily used as items of commerce. *Cf. Jones*, 529 U.S. at 856, 120 S.Ct. 1904 ("The home's only 'active employment,' so far as the record reveals, was for the everyday living of Jones's cousin and his family."). In *Jones*, the Court concluded that owner-occupied homes were not "used in" interstate commerce, even though such homes are obviously bought and sold in a commercial market. Church buildings, like owner-occupied homes, may from time to time be bought and sold in a market. But the "active employment" of church buildings is for the conductance of spiritual activity. *Cf. Russell v. United States*, 471 U.S. 858, 862, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985) (stating that rental of an apartment unit is "mere-

ly an element of a much broader commercial market in rental properties"); *United States v. Geiger*, 263 F.3d 1034, 1037 (9th Cir.2001) (stating that local lease of truck is "merely an element of a much broader commercial market" in trucks for lease); *United States v. Serang*, 156 F.3d 910, 913 (9th Cir.1998) (stating that a restaurant "as a commercial enterprise" had "a per se substantial effect on interstate commerce"); *United States v. Gomez*, 87 F.3d 1093, 1096 (9th Cir.1996) (stating that an apartment building is a commercial establishment part of broader national market in rental properties).

**5.** We refer to the facts set forth in the stipulation as facts one through six. See listing, *supra* page 1253.

one, the operations of the national or regional religious institution, of which the Spokane church is a part, demonstrates neither *interstate* activity nor *commercial* activity on the part of the *local* church; indeed, it appears to be irrelevant to determining the uses to which the church building in question is put.[6] Likewise, fact five (interstate and international receipt of funds), appears to refer to the collection and distribution of funds involving the parent religious organization.[7] That the church may receive from or transmit funds to a national or religious entity with which it is affiliated does not mean that its activity has changed from non-commercial to commercial. Even non-commercial enterprises need funds with which to operate. Thus, these facts shed no light on whether the building at issue was used in interstate commerce for purposes of § 844(i), or whether the Spokane church, as a religious institution, is engaged in commercial activities.

As for the remaining factors, they constitute the type of attenuated contacts with interstate commerce that this particular church and most other churches in modern society have, and that are insufficient to bring a religious entity within the statutory definition. *Jones* emphasized that, in reviewing the application of § 844(i) to a particular arson, we must look for "active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce." *Jones*, 529 U.S. at 855, 120 S.Ct. 1904. Accordingly, as in all cases in which Congress adopts criminal laws in an area traditionally occupied by the states, we must examine such purported interstate commerce connections with a fair degree of skepticism, to ensure that the federal government prosecutes only those individuals over whom it has the proper authority.

Neither of the two facts that apply to the church as a religious organization supports any connection to interstate commerce: neither fact four (receipt of goods) nor six (receipt and distribution of publications—presumably religious) individually or collectively shows an effect on interstate commerce. It is difficult to imagine how these two facts would, in the case of a church, ever support an interstate commerce effect. In our modern world, no person or institution but the most hardily self-sufficient is free from possessing some amount of goods that have, at one point in time, traveled interstate. Moreover, the distribution of publications regarding religion is simply an important part of the functioning of a church; it is an essential aspect of promoting religious beliefs. All of these activities are ultimately directed to the purpose of maintaining a church's non-economic and non-commercial essential function: to provide a means of shared, organized worship for its membership.

▪ Nor do the remaining facts, which refer to the church building, support a finding that the Spokane church was connected to interstate commerce. Fact two (the receipt of gas) is precisely the kind of alleged connection rejected as too attenu-

---

**6.** To be clear, we construe this part of the factual stipulation to refer to the fact that the Subud religious organization serves the Pacific Northwest, and has several chapters in that part of the country, *not* that members come from across state lines to worship at the Spokane church. The Subud Northwest's own internet website suggests as much. *See* http://www.subudpnw.org/center.html (last visited April 24, 2003) (listing Subud churches in Alaska, Idaho, Washington, Oregon, and Montana).

**7.** Fact five is difficult to parse. The elements are set forth in an incomplete and inarticulate non-sentence. In addition to the financial matters, it appears to refer to the Spokane church's membership (and not the regional entity's) when it states that "several members are from out of state."

ated in *Jones,* 529 U.S. at 856, 120 S.Ct. 1904, and in *Pappadopoulos,* 64 F.3d at 527–28, to permit application of the statute. *See Odom,* 252 F.3d at 1295 ("The purchase and receipt of goods or services necessary for or common to the maintenance of any building, such as gas, electricity, insurance, or mortgage loans, do not prove that the function of the building is to engage in commerce."). So, too, is fact three (out-of-state insurance policies). In *United States v. Johnson,* the Fifth Circuit stated that "an out-of-state company's payment of an insurance claim does not amount to an explicit connection or effect on interstate commerce." 194 F.3d 657, 662 (5th Cir.1999), *vacated by* 530 U.S. 1201, 120 S.Ct. 2193, 147 L.Ed.2d 230 (2000), *remanded to* 246 F.3d 749 (2001) (vacating defendant's guilty plea as in original disposition). Like the Fifth Circuit, we agree that being insured by an out-of-state

insurer does not establish that a building is used for an activity in interstate commerce. *See also Jones,* 529 U.S. at 856, 120 S.Ct. 1904 ("It is surely not the common perception that a private, owner-occupied residence is 'used' in the 'activity' of receiving natural gas, a mortgage, or an insurance policy.").[8]

■ In sum, we hold that, ordinarily church buildings are neither "used in" interstate commerce nor in any activity affecting interstate commerce as those terms are employed in § 844(i), and thus generally do not fall within the purview of the federal arson statute.[9]

### 5. Other Circuits

Decisions by other circuits post-*Jones,* in the main, support our conclusion that § 844(i) cannot be applied to a church, at least in the absence of some unusual connection to interstate commerce.[10] For ex-

**8.** Finally, the government, citing *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), argues that the facts contained within Lamont's plea agreement—concerning whether the church was "used in" interstate commerce—when "considered in the aggregate" are sufficient to allow application of § 844(i) to Lamont's conduct. This argument fails because this kind of aggregation argument has been rejected in *United States v. Morrison,* 529 U.S. 598, 611 n. 4, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000).

**9.** We note the existence of language in the federal religious property damage statute that is similar in some respects to the language that we construe here. That statute, 18 U.S.C. § 247(a), provides that:

(a) Whoever, in any of the circumstances referred to in sub-section (b) of this section—
(1) intentionally defaces, damages, or destroys any religious real property, because of the religious character of that property, or attempts to do so . . .
. . .
shall be punished as provided in subsection (d).

(b) The circumstances referred to in subsection (a) are that the offense *is in or affects interstate or foreign commerce.*
(emphasis added). *See United States v. Ballinger,* 312 F.3d 1264 (11th Cir.2002) (holding that church arsons in question did not have a substantial effect on interstate commerce so as to permit application of § 247(a)(1)). Because the statute refers to an "offense" that affects interstate commerce, rather than a "building" that is "used" in an "activity" that affects interstate commerce, we offer no comment with respect to the construction or constitutionality of that statute, and do not speculate whether the Spokane Subud church would fall within its jurisdictional limits.

**10.** Because they concern types of property other than church buildings, cases cited by the government that address the application of § 844(i) have little relevance to our discussion. *See, e.g., Gomez,* 87 F.3d at 1094–96 (rejecting statutory challenge to § 844(i) when applied to arson of rental apartment complex); *Gaydos,* 108 F.3d at 509–11 (rejecting constitutional challenge but *upholding statutory challenge to application of § 844(i)* to rental home no longer in rental market); *United States v. DiSanto,* 86 F.3d 1238, 1248 (1st Cir.1996) (holding that rental property is

ample, in *Odom*, the Eleventh Circuit, in reversing the defendant's convictions under the federal arson statute, held that insufficient facts had been established to show that the church in question had a connection to interstate commerce.[11] In that case, the government offered evidence, similar to that which we consider here, that the church had engaged in interstate commerce by 1) receiving donations from out-of-state, 2) using Bibles and prayer materials purchased from out-of-state sources, and 3) indirectly contributing to an out-of-state church organization through its membership in an in-state church organization. 252 F.3d at 1296–97. These connections, the *Odom* court held, "are too passive, too minimal and too indirect to substantially affect interstate commerce." *Id.* at 1297. *See also Rea*, 300 F.3d at 962 (vacating defendant's guilty plea because church annex in question, sometimes used for Sunday school and tutoring, had minimal connections to interstate commerce); *Johnson*, 194 F.3d at 662 (vacating defendant's guilty plea because underlying facts, including out-of-state insurance payment and indirect contribution of funds to national church orga-

nization, were insufficient to allow application of § 844(i)).[12]

We note that two recent cases from other circuits have upheld the application of § 844(i) to churches. In *United States v. Terry*, 257 F.3d 366 (4th Cir.2001), the Fourth Circuit held that the church at issue there fell within the ambit of the statute because of the church building's ancillary use as a daycare center. Similarly, in *United States v. Rayborn*, 312 F.3d 229 (6th Cir.2002), the Sixth Circuit found the federal arson statute applicable to a church that had actively employed the services of three radio stations for regular radio broadcasts. As we have stated earlier, the Spokane Subud church, like most other churches, did not engage in those activities or in any similar activity that *might* be deemed by *some* to be of a commercial or economic nature. Accordingly, we need not decide here when, if ever, such ancillary activities constitute interstate commercial activity for purposes of the statute. For example, we need not decide whether ancillary activities intended to promote or foster the mission of a religious institution are to be treated dif-

---

*per se* sufficiently connected to interstate commerce to confer jurisdiction under § 844(i)); *United States v. McMasters*, 90 F.3d 1394, 1398–99 (8th Cir.1996) (rejecting facial and as-applied challenges to application of § 844(i) to arson of rental home); *United States v. Sherlin*, 67 F.3d 1208, 1212–14 (6th Cir.1995) (rejecting constitutional and statutory challenges to application of § 844(i) to arson of college dormitory); *Martin*, 63 F.3d at 1425–27 (rejecting statutory challenge to conviction under § 844(i) for arson of apartment building). Moreover, none of these cases was decided after *Jones*, which strongly suggests that reviewing courts rigorously examine the application of § 844(i) to buildings without an obvious commercial or economic character. 529 U.S. at 858, 120 S.Ct. 1904.

11. We recognize that in their decisions, other circuits have not distinguished as rigorously among the possible meanings of the term

"church" as we have here. Nor do they all consider the question of "commerce" apart from its "interstate" aspect. Accordingly, we discuss their analyses on their own terms, though they may not comport necessarily with ours.

12. While *Rea* found that the church annex in question was not involved in interstate commerce, the Eighth Circuit did conclude that the activities held in the annex, including weekly Sunday school classes, trustee meetings, and youth tutoring, were conducted in intrastate commerce. 300 F.3d at 961. *See also Odom*, 252 F.3d at 1295 (stating that the receipt of donations, purchase of hymnals, and payments of dues are commercial activities). We do not take such a sweeping view of commercial activity, and would categorize these activities, along with fund raising and pamphleteering, as directly related to a church's non-commercial spiritual mission.

ferently from activities of a similar nature designed principally to take advantage of commercial opportunities. We expressly reserve such questions for an appropriate case.[13]

*CONCLUSION*

We hold that a church building used by a church that simply engages in ordinary religious activities is neither used in interstate commerce nor in any activity affecting interstate commerce within the meaning of the federal arson statute, 18 U.S.C. § 844(i). The government's factual proffer underlying Lamont's guilty plea is insufficient to support a conviction under the statute. We reverse the judgment of the district court and remand with instructions to vacate the plea and dismiss the indictment.

REVERSED and REMANDED with instructions.

---

**13.** Two other cases of which we are aware, involving related claims under § 844(i), are also distinguishable. In *United States v. Beck*, 250 F.3d 1163, 1165 (8th Cir.2001), the Eighth Circuit held that the defendant could not challenge on statutory grounds his conviction for the arson of a church because, unlike Lamont, he had failed to enter a conditional guilty plea. Similarly, in *United States v. Grassie*, 237 F.3d 1199, 1204 (10th Cir.2001), the Tenth Circuit rejected the defendant's statutory construction claim because he had entered into a factual stipulation with the government regarding interstate commerce before proceeding to trial.

The government insinuates in its brief that Lamont has also waived any argument by reference to an exchange in which the district court asked, "Do you also agree that the church itself was involved in interstate commerce; by that I mean some members came across the state line?," and Lamont answered, "Yes, I now agree." Transcript of March 27, 2000, at 14. As discussed earlier, however, Lamont's plea agreement explicitly noted that his plea was conditional. Second, the fact on which the district court relies—that "some members came across the state line"—is by itself insufficient to allow the application of § 844(i) in this case, for the reasons we have already discussed. In any event, the government has waived any waiver argument it might have offered. *See United States v. Doe*, 53 F.3d 1081, 1082 (9th Cir.1995) (holding that government implicitly waived waiver argument by failing to raise it adequately on appeal).